# EXHIBIT A

# KROLL
# REPORT OF AUDIT
# CONDUCTED ON TOWN OF SALEM
# POLICE DEPARTMENT



October 12, 2018

# Report of Audit

**Prepared for**

Mark T. Broth, Esq. of Drummond Woodsum

Daniel P. Linskey
Managing Director, Security Risk Management

Kroll, a division of Duff & Phelps
225 Franklin Street, Suite 2100
Boston, MA 02110
T +1 617.350.7878 | M 857.275.2510

**kroll.com**

**IA  Redacted**

*Private and Confidential*

Certain Kroll companies provide investigative services.
See www.kroll.com/licensing for state licensing information.



## Private & Confidential

### Restricted Use Warning

This report was prepared by Kroll at the request of the client to whom it is furnished. The client agrees that reports and information received from Kroll, including this report, are strictly confidential and are intended solely for the private and exclusive use of the client only in connection with a business, investment or other commercial purpose. Any other use (including for employment purposes, credit evaluation or insurance underwriting purposes) is strictly prohibited and client has agreed that no such use will occur. Any communication, publication, disclosure, dissemination or reproduction of this report or any portion of its contents to third parties without the advance written consent of Kroll is not authorized. Kroll assumes no direct, indirect or consequential liability to any third party or any other person who is not the intended addressee of this report for the information contained herein, its interpretation or applications, or for omissions, or for reliance by any such third party or other person thereon. To the extent information provided in this report is based on a review of publicly-available records, such information, as presented, relies upon the accuracy and completeness of those records, which have not been corroborated by Kroll. Statements herein concerning financial, regulatory or legal matters should be understood to be general observations based solely on Kroll's experience as risk consultants and may not be relied upon as financial, regulatory or legal advice, which Kroll is not authorized to provide. All such matters should be reviewed with appropriately qualified advisors in these areas. THIS REPORT DOES NOT CONSTITUTE A RECOMMENDATION, ENDORSEMENT, OPINION OR APPROVAL OF ANY KIND WITH RESPECT TO ANY TRANSACTION, DECISION OR EVALUATION, AND SHOULD NOT BE RELIED UPON AS SUCH UNDER ANY CIRCUMSTANCES.

 **Kroll.** | A Division of **DUFF&PHELPS**          Drummond Woodsum

# Contents

1.    Introduction & Scope of Audit .............................................................................4
    Introduction.........................................................................................................4
    Scope of Audit ...................................................................................................12

2.    Review of CBA / Contracts .................................................................................14
    Concerns with Salem Police Relief N.E.P.B.A. Local #22 CBA ...........................14
    Concerns with Salem Public Administrators Association CBA...............................19

3.    Review of Departmental Policies.........................................................................22

4.    Retention of Internal Affairs Investigative Files ...............................................28

5.    Review of Internal Affairs Investigations............................................................39

6.    Kroll's Communications with External Citizens ..................................................92

7.    Union Issues.......................................................................................................109

8.    Findings and Recommendations..........................................................................111

**Kroll.** A Division of
DUFF&PHELPS

# 1. Introduction & Scope of Audit

## Introduction

Kroll was engaged by the law firm, Drummond & Woodsum, on behalf of the Town of Salem, New Hampshire, to audit the operations and efficiencies of the Salem, New Hampshire Police Department ("Salem PD"), namely related to the following:

- time and attendance practices of personnel within the Salem PD, and
- internal affairs investigative practices within the Salem PD.

Kroll has separated these tasks into two reports, with this report focusing on the Salem PD's internal affairs practices, as compared to best practices for law enforcement agencies nationwide. Specifically, Kroll evaluated the process by which the department handles internal affairs investigations to determine how these current practices impact and affect the operations of the department, the work environment of the Salem PD personnel and the community of Salem, New Hampshire, as a whole. Kroll's mandate was to review the process, in its entirety, and make a determination as to its fairness and comprehensiveness, and whether it is in line with widely-regarded law enforcement best practices. Kroll was not tasked with conducting an independent review of facts or circumstances surrounding individual complaints filed against Salem PD personnel.

It is widely accepted that law enforcement agencies will receive complaints concerning the conduct or behavior of its personnel. Police officers have the unique authority to remove a person's freedom, as well as take a human life. An effective and comprehensive internal affairs investigative process is meant to ensure that policing of our communities is done legally and ethically while also ensuring compliance with department-mandated policies and procedures. A citizen has the right to submit a complaint about alleged improper conduct by its police personnel, and it is essential that the complaint be thoroughly investigated. Further, if the complaint is sustained, the department must take appropriate action to address the issue. This process is fundamental to establishing the necessary trust and confidence to effectively police a community.

Just as fundamental is the principle that police officers can be sure that their actions, which are often made during times of tension and conflict, will be fairly and impartially investigated regardless of who is making the complaint, and that if their actions are found to be within the law and conducted in

accordance with the department's policies and procedures, they will be supported by their department. Kroll acknowledges that complaints may be lodged against officers merely as retribution for enforcement actions they may have taken, and it is just as important for these investigative measures to disprove a false complaint as it is to prove and sustain a valid one. It is also critical that if an officer is found to have conducted him- or herself improperly or inappropriately, that the response from the department is seen as appropriate and proportionate to the incident. Officers who have complaints sustained against them should be able to anticipate a consistent outcome. Officers committing the same offense, should all things be equal, must be treated the same. If the offense mandates additional training, a reprimand or a more formal disciplinary action, there should be no fear that individuals will be treated differently because of who they are or with whom they have aligned themselves within the department.

Specifically, it is Kroll's opinion that when determining how to respond to a complaint, police leadership should, at the very least, ask the following questions of all parties involved: "What happened? Why did it occur? Was it an honest mistake or an intentional violation? What previous history is there of complaints against this employee?" Police officers are certainly capable of and do make mistakes, respond imperfectly under stress or have bad days; however, some may also deliberately engage in inappropriate or criminal behavior, just like members of the very community which they are bound to serve and protect. Therefore, it is the goal of appropriate and impartial internal affairs investigations to not only protect the citizens of the community but also the law enforcement personnel tasked with serving those citizens.

## Key Personnel

### Mark Broth

Mark Broth is an attorney with Drummond Woodsum's labor and employment group. His practice "focuses on the representation of private and public employers in all aspects of the employer-employee relationship."[1] He is currently representing the Town of Salem, New Hampshire in this investigation.

### Chris Dillon

Chris Dillon was appointed as town manager of Salem, New Hampshire on August 7, 2017, replacing outgoing Town Manager Leon Goodwin. As town manager, Dillon "works to oversee the day-to-day operations of Salem and will work with the five-member Board of Selectmen."[2]

---

[1] http://www.dwmlaw.com/PROFESSIONAL?id=6
[2] "Dillon tapped as new Salem town manager," *New Hampshire Union Leader*, September 7, 2017.



**Chief Paul Donovan**

Paul Donovan was appointed as chief of the Salem PD in 2001 following 20 years as an officer with the Hartford, Connecticut Police Department.[3]

**Deputy Chief Robert Morin**

Robert Morin is deputy chief of the Salem PD. Deputy Chief Morin also serves as union president, representing those with the title of lieutenant and above.

**Captain Joel Dolan**

Joel Dolan is a captain with Salem PD.

**Captain Michael Wagner**

Michael Wagner is a captain with Salem PD.

**Sergeant Michael Verrocchi**

Michael Verrocchi was promoted to sergeant in March 2016. Sergeant Verrocchi is union president for sworn personnel, ranging from patrol officers to lieutenants.

**Keith Hickey**

Keith Hickey served as town manager of Salem, New Hampshire from 2010 to 2015.

**Leon Goodwin**

Leon Goodwin served as Salem, New Hampshire assistant town manager from October 2013 to December 2015 and then became town manager in December 2015. He served in this role until January 1, 2018. Goodwin is currently a foreign service officer with the U.S. State Department.

**Molly McKean**

Molly McKean previously served as human resources director for the Town of Salem, New Hampshire. She left this position in December 2017. She is an employment lawyer by training and is currently employed at Saint Anselm's College as executive director of human resources.

---

[3] "Chief Donovan Says Salem Police 'Prepared and Capable' for Casino," *Salem Patch*, April 17, 2013.

**Kroll.** | A Division of
**DUFF&PHELPS**

Drummond Woodsum

## Background

Attorney Broth, as well as Town Manager Dillon, informed Kroll that they had received informal complaints from individuals over the years stating that the internal affairs process at the Salem PD was perceived as unfair and incomplete. They were told that the department was known to discourage citizens from making formal complaints, and when complaints were, in fact, submitted, the investigative actions were insufficient or disregarded entirely. In some instances, they informed Kroll, decisions about whether to sustain or not sustain a complaint, and subsequently issue discipline, were based on popularity within the department's leadership instead of on the merits of the case. They stated that similar concerns were raised with two previous town managers, with one even discussing initiating an audit of the police department with Chief Donovan. The chief welcomed such a review but expressed concerns that the independent entity being considered for the assignment did not have the relevant professional experience of dealing with a law enforcement agency, and as such, the review did not proceed.

Dillon, while serving in his prior role as director of recreation for the Town of Salem, told Kroll he had heard complaints of similar concerns regarding the Salem PD's internal affairs program. He noted that in his previous role, he interacted daily with town residents and employees, and that during those interactions, he often received information concerning the professionalism of the Salem PD. One such discussion involved ████████ in the Salem PD who was asked about injuries that a suspect sustained after fleeing into a wooded area. ████████ responded with, "Well, if you are going to make us run, you are going to pay the price." Kroll notes that, without further insight into the interaction, the supervisor's response indicates that force may be utilized on an individual as a form of punishment instead of necessity.

Similarly, upon his appointment as town manager, Dillon received additional information concerning the department's internal affairs process. Individuals expressed concerns over being discouraged from filing a complaint, as well as about the complaint form itself. It was revealed that the form unnecessarily required a signature under pains and penalties of perjury and warned that any false or misleading statements by a complainant could lead to civil or criminal prosecution. A copy of this form is included as follows:

**Kroll** | A Division of **DUFF&PHELPS**                    Drummond Woodsum

Complaint Intake Form

ICI File #: _____

Name of Complainant_____

Address_____

_____

Phone Number_____    Date of Incident_____

Employee Names_____        _____

Alleged Misconduct_____

_____

The following will be presented to an identifiable complainant by the Supervisor receiving the complaint and/or Assigned Investigator for review and signature. A refusal will have an appropriate weight placed on it during the investigation.

STATEMENT OF AFFIRMATION

I, _____, do hereby affirm that the attached information is true and complete to the best of my knowledge and belief. I understand that false, misleading or untrue statements, accusations or allegations, herein made by me, either orally or in writing to any person investigating this complaint may subject me to civil and/or criminal prosecution.

I further realize that it may be necessary for me to meet with investigators or others to discuss this complaint. I understand that my testimony before a court or other administrative hearing may be required. I hereby agree to make myself available for such hearings or court upon reasonable request.

_____            _____
Complainant Signature            Witness

Method Received:                 Complainant advised of our procedures in
Telephone _____                 conducting investigations  Y _____ N_____
In Person _____
By Mail _____
Written Statement_____          _____
Outside Source _____            Date          Time
(BOS, Town Mgr, rec'd complaint)_____

                                 _____
                                 Receiving Supervisor

                                 _____        _____
                                 Reviewed             Assigned to

GO# 65-3, Attachment A

Dillon told Kroll that he requested a copy of the form from the Salem PD on several occasions but never received one.

Kroll also learned of significant tension between the Salem PD's administration and the town's administration, which has existed for several years. The town administration stated that they were perceived as interfering or impeding with the Salem PD's operations whenever they made a request, sought information or commented on the department's operations. They attributed the tension to interpretations of the department's collective bargaining agreements ("CBA"), with the Salem PD often countering their requests by saying that the town's actions violated the department's CBA and were, therefore, unlawful.



This issue presented itself most recently in early 2018 when Dillon received a complaint regarding Salem PD officers. The complainant informed Dillon that they felt the need to contact him directly – instead of contacting the Salem PD directly – because several people, including a former member of the Salem PD, had told them that their complaint would not be investigated properly if they went directly to the front desk at the Salem PD. Dillon informed the complainant that they needed to put their complaint in writing. The complainant followed that recommendation, and the town manager forwarded the complaint to Chief Donovan for consideration. The chief and others at the department informed Dillon that they could not investigate the complaint because the town manager's directions to the complainant violated the department's CBA. The town manager disagreed and sought legal counsel. Kroll notes that the complaint form below clearly has a section for complaints received from the board of selectmen and the town manager:



There was then a meeting with Broth, Dillon and Chief Donovan. After that meeting, the chief forwarded the complaint to the Office of the Attorney General in Concord, New Hampshire for a determination as to any criminality posed by the Salem PD. The Attorney General's Office responded with a letter stating that the Salem PD's actions were not criminal in nature and referred the matter back to the Salem PD for further consideration. Chief Donovan informed Dillon that the Attorney General's Office had cleared the officers and that no further investigation or response was needed. Dillon disagreed with the chief's interpretation of the Attorney General's Office's response and engaged Kroll to conduct an independent, third-party audit and review of the Salem PD's internal affairs program.

## Kroll's Investigative Team

Kroll's primary investigative team was led by the following professionals:

### Daniel Linskey ("Linskey"), managing director

Linskey is a former superintendent-in-chief of the Boston Police Department and a 27-year veteran of the force. He notably led the Boston Police Department through some of the most tragic and contentious events in the city's history, including the Boston Marathon bombings and the Occupy Movement.



Drummond Woodsum

As a managing director at Kroll, Linskey serves clients in diverse industries with internal investigations, crisis response measures and risk management, as well as personal, physical and operational security strategies. He leads Kroll's worldwide law enforcement consulting practice. Widely respected for his knowledge of the complexities inherent in law enforcement and homeland security, Linskey has also consulted with several national and international government agencies on a broad range of challenges, including large-scale event management, crisis leadership and preparedness, and community engagement strategies.

Linskey was a member of the United States Department of Justice's team requested by the St. Louis County Police Department to respond to Ferguson, Missouri after the officer-involved shooting by Darrin Wilson. While there, the team conducted a collaborative review of the department. Linskey co-authored the report _Collaborative Reform Initiative an Assessment of the St. Louis County Police Department_ (https://ric-zai-inc.com/Publications/cops-p316-pub.pdf).

Linskey also has extensive experience developing and conducting law enforcement training to line level officers, first line supervisors, speciality units and senior leaders of agencies. He has provided training to numerous law enforcement personnel from across the globe through the U.S. State Department's ATA Program.

Linskey has served as an expert witness relative to appropriate police policy and procedure for several law firms and police departments, including the New Hampshire Attorney General's Office. He is a graduate of the FBI National Academy Class 243, as well as the Harvard University Kennedy School, National Leadership Preparedness Initiative in 2014.

### Katy Shanahan ("Shanahan"), managing director

Since joining Kroll in 2006, Shanahan has worked on, and currently manages, a variety of complex multijurisdictional investigations on behalf of clients in diverse sectors, including large-scale due diligence assignments in support of IPOs and other transactional dealings, asset searches, investigations of employee fraud and misconduct, and theft of intellectual property. Her efforts support her clients' needs in crisis management, litigation support and corporate contests. Additionally, she has significant experience in both cyber security and physical and operational security casework. Prior to joining Kroll, Shanahan was an investigator with the U.S. Department of Labor's Office of Labor-Management Standards. There, she helped promote labor union and labor-management transparency through the enforcement of reporting and disclosure requirements for unions and their officials, employers, labor relations consultants and surety companies.

 | A Division of
DUFF&PHELPS

Drummond Woodsum

**Roy Bethge ("Bethge"), former deputy chief of operations for the Buffalo Grove Police Department**

Roy Bethge is a veteran police leader with more than 28 years of experience. He retired in May 2017 as deputy chief of operations for the Buffalo Grove Police Department in northern Illinois. His responsibilities included leadership of the patrol and investigations division with oversight of the public information function. He holds a master's degree in criminal justice from Columbia College and has an extensive background as a trainer in the subject areas of leadership development, officer safety, use of force and adult learning. Bethge is co-founder and lead instructor of The Virtus Group, Inc., which brings innovative leadership training and personal development instruction to law enforcement professionals around the country. As part of that endeavour, Bethge is co-creator of the *WINx: Inspiring Leadership in Law Enforcement* conference, which is a TED-style experience focused on law enforcement professionals.

**Dr. Laura King ("King"), chief investigator for the McHenry County State's Attorney's Office**

Dr. Laura King began her career in 1996 with the McHenry, Illinois police department. She quickly moved up the ranks from patrol to investigations and was promoted to patrol sergeant. She soon became administrative sergeant, followed by commander. In 2016, Dr. King was appointed as chief investigator for the McHenry County State's Attorney's Office, where she leads a team of professionals offering investigative support to prosecutorial teams county-wide. Dr. King is a liaison between the state's attorney's office and local law enforcement agencies to improve communications and operations with the intent to bring about more successful prosecutorial efforts.

Dr. King holds a doctorate of philosophy in psychology, a master of science degree in psychology and a bachelor of science degree in criminal justice administration. She is a graduate of the FBI's prestigious National Academy (265th Session) and also graduated from Northwestern University's School of Police Staff and Command (266th Session). In 2016, Dr. King was invited to Washington D.C. to participate in a roundtable hosted by the Department of Justice's National Institute of Justice in its exploration of how best to establish, support and/or expand the in-house research and analytic capacity of law enforcement agencies around the country.

**Kroll.** | A Division of
DUFF&PHELPS

Drummond Woodsum

# Scope of Audit

Kroll's efforts included the following:

- Met with Attorney Broth, Town Manager Dillon, Deputy Chief Morin, Captain Dolan and Captain Wagner to develop an audit plan and gather information concerning the internal affairs process, as well as potential areas for review.

  - The meeting was intended to include Attorney Broth, Town Manager Dillon, Kroll and Chief Donovan; however, the chief was out of work on a personal matter when the meeting occurred. His absence was unknown by Kroll or the others when the meeting was scheduled.

- Requested department-related policies and procedures, as well as CBA documents.
- Requested five years of comprehensive internal affairs files.
- Requested three years of arrest reports.
- Requested three years of use of force reports.
- Reviewed department policies and procedures, as well as CBA documents.
- Reviewed internal affairs files.
- Conducted interviews of the following:

  - Chief Donovan
  - Deputy Chief Morin (union president)
  - Captain Dolan
  - Captain Wagner
  - Sergeant Verrocchi (union president)
  - Individuals who contacted Kroll after learning of Kroll's involvement in the audit and who had direct experience with or knowledge of the Salem PD internal affairs program.

    - Several citizens contacted Kroll under the belief that Kroll was tasked with re-investigating complaints made against Salem PD personnel. While Kroll spoke with these individuals, they were all informed that Kroll's audit was limited to an audit and review of the department's internal affairs program and not a re-investigation of submitted complaints.

  - Town Manager Dillon
  - Former Town Manager Keith Hickey
  - Former Town Manager Leon Goodwin

**Kroll.** | A Division of
DUFF&PHELPS

Drummond Woodsum

- o   Former Human Resources Director Molly McKean
- Reviewed three years of use of force reports.
- Reviewed three years of arrest reports.
- Reviewed current publications and policies regarding best practices for internal affairs.

**Kroll.** A Division of DUFF&PHELPS

# 2. Review of CBA / Contracts

There are currently three collective bargaining agreements in place for the Salem Police Department:

1. The agreement between the Town of Salem, New Hampshire and the Salem Police Relief N.E.P.B.A. Local #22, in effect from April 1, 2016 to March 31, 2020, covering patrol officers, sergeants, dispatch supervisor, dispatchers and animal control officers.

2. The agreement between the Town of Salem, New Hampshire and the Salem Public Administrators Association, in effect from April 1, 2017 to March 31, 2020, covering the deputy police chief, police captains and police lieutenants.

3. The collective bargaining agreement between the Town of Salem, New Hampshire and the Salem Administrative and Technical Employees, in effect from April 1, 2017 to March 31, 2020, covering administrative staff and clerks.

Due to the scope of this Audit, this report will concentrate on the Salem Police Relief contract and the Public Administrators Association contract since these are the two agreements that specifically relate to and address the internal affairs procedures applicable to sworn staff members. Each of these contracts will be reviewed in depth with a summary offered related to how the contracts impact the current internal affairs process, as well as how they compare to national best practices followed by accredited police agencies.

## Concerns with Salem Police Relief N.E.P.B.A. Local #22 CBA

### Article 1: Agreement, Purpose and Non-Discrimination

Article 1 clearly stated this agreement is between the Town of Salem, New Hampshire and the Salem, New Hampshire Police Relief (hereinafter called the "Union"). It goes on to state "the purpose of the agreement is to... set forth terms and conditions of employment." At no time does this agreement specify the chief's role as superseding authority over matters. In fact, the agreement is clearly made between the Town and the Union.



## Article 4: Management Rights

Article 4 of this document covers management rights. It begins with the following wordage:

1. The parties agree that all rights and responsibilities of the Town which have not been specifically provided for this agreement are retained in the sole discretion of the Town. The right to determine and structure the goals, purposes, functions and policies of the Town without prior negotiations with the Union shall include:

   a. The right to direct employees, to determine qualifications, hiring criteria, to establish standards for work, retain employees in positions.
   b. The right to lay off personnel due to budgetary constraints and/or lack of work.
   c. The right to take such actions as in its judgment is necessary to maintain the efficiency of Department operations.
   d. The right to determine the means, methods, budgetary and financial procedures, and personnel by which the Department operations are to be conducted.
   e. The right to make personnel rules, regulations, and policies not inconsistent with the provisions of this agreement and to require compliance therewith.

Management rights then continues to address other areas including the chief and command staff's authority in emergency situations, employees right to grieve and a provision that the Town agrees not intentionally violate the agreement. It is the specific wording of number one and its subsections that we must focus our attention.

Clearly management rights are established early in the document to offer guiding principles to ensure all parties are following the contract in good faith. In the first section (offered above), we see that any area outside of the areas covered specifically by the contract revert to the authority of the Town. This section goes on to address specific subsections, or areas, where the Town has ability to impose structure without prior negotiations with the Union. The first subsection speaks specifically to "establishing standards of work and retain employees in positions." In the third subsection we see the Town being granted "The right to take such actions as in its judgment is necessary to maintain the efficiency of Department operations." These subsections are offered to detail areas where the Town can take actions without prior negotiations with the Union.



It is recognized that a healthy work environment would have each employee answering to one main authority figure. While this is usually the chief of police, because of the sensitivity of matters of establishing and maintaining public trust, the Town must maintain some authority and ability to look into concerning matters. This is necessary both because of the history of police corruption in this country and because citizens may not feel comfortable going to the police department to report concerning behavior of one of their own employees. In specifically giving the Town "the right to direct employees, to determine qualifications…to establish standards for work, retain employees in positions…(and) to take such actions as in its judgement is necessary to maintain the efficiency of Department operations" the Town is granted a level of oversight authority on Department operations. All of these things are extended with the agreement established in number 4 of this article stating "…(the) rights and powers shall not be exercised unfairly as to any employee and shall not be exercised as to violate any provisions of this contract." It is determined this allows the Town authority over these areas of responsibility as long as fair and impartial procedures are being followed.

## Article 6: Employee Rights and Responsibilities

Article 6 established a clear procedure for complaints brought against a member of the unit. This article offers a step by step process for complaint handling. The process begins with the chief or supervisor notifying the employee within ten business work days that the complaint has been filed. The employee is entitled to a written document explaining the exact nature of the complaint, the date and time of the offense and the name of the individual bringing the allegation. It then states if the chief of supervisor does not act upon a civilian complaint, the complaint shall be destroyed and shall not be placed in the employee's personnel file. This is not reasonable for efficient functioning of a police department. While it is understood how important timeliness is in addressing issues, this article would suggest if this ten-day rule is unintentionally violated that the complaint disappears for all purposes. This provision does not make sense from an operational perspective. It could potentially erode the public trust by allowing legitimate citizen complaints being brought forward by a concerned public to be ignored due to a technicality in the collective bargaining agreement.

This article goes on to set guidelines for investigations to be completed within 10 business work days and a hearing to be scheduled within 10 business work days of the completion of the investigation. The article continues to explain an investigation that could result in criminal prosecution of the employee or a civil rights violation against the employee or Town has an extended time period for completion of the investigation. This is understandable considering the serious nature of this type of investigation. Despite the extended time allowed for an investigation, there is no exception offered in this article for



missing the initial 10-day initiation guideline. This is concerning as it would allow the chief or the assigned supervisor the ability to intentionally delay the initiation of the investigation of a complaint which would result in the complaint being ineligible for investigation in accordance with the terms of this contract.

This article explains that all disciplinary action shall be subject to the Discipline & Termination and Grievance Procedure articles of the agreement. The article concludes by stating that an exoneration, a failure to sustain the complaint or a finding of an unfounded allegation would all result in no documentation related to the complaint appearing within the employee's file. It goes on to clearly state that "in no event will complaints of any nature be kept in the employee's personnel file, maintained at the Town Offices, without his/her knowledge." It is assumed this is in reference to unfounded, non-sustained or complaints resulting in exoneration. It is important to note that national best practices would require the chief to maintain a confidential file with all allegations and subsequent investigations, regardless of findings to be maintained in a secure location. This is important for several reasons. First, human error is a fact of life and persons conducting internal investigations are not exempt from it. Second, for purposes of early warning, all complaints and the nature of said complaints must be tracked by the agency to be used to identify concerning patterns of behaviour. This must be done in order to responsibly run a law enforcement agency to ensure the public trust is not violated and someone is monitoring high risk areas such as racial bias, use of force and ethical violations.

## Article 9: Grievance Procedure

Article 9 defines a grievance as an alleged violation of any of the provisions of this agreement except those specifically noted in the management rights article. It is important to note that management rights is the article that gives the Town superseding authority over police operations and the right to act to maintain the efficiency of the department operations. This section clearly describes the procedure for grieving violations of the CBA by members of the union against the Town.

## Article 11: Discipline and Termination for Cause

Article 11 is where the disciplinary process is detailed. The steps to be followed per contract are clear but a provision in number 1 of this article clearly allows the Town to reserve the right to assess discipline on the merits of the offence and initiate discipline at any step.

In the first paragraph offered under number 2 of this article, proper reasonable cause for discipline is defined. In addition to a list of lesser violations "behavior detrimental to the Town (and) conduct



unbecoming an officer" are listed. The next sentence places limits on the Town's ability to address matters. It requires the conduct leading to the disciplinary action must have occurred within six (6) months of the initiation of the action. This is problematic because at times the public does not report offenses in a timely manner. This is especially true if members of the public feel intimidated by the police culture.

While a six-month reporting period may be appropriate for policy violations or complaints of rudeness by officers, a six-month restriction for criminal behavior or civil rights violations is unreasonable. By having this provision in the contract, the contract in essence takes away the ability of the Town, the chief or any supervisor to address matters involving a significantly delayed report of police misconduct. In matters that are criminal in nature, this time frame would be lesser than the statute of limitations imposed by legislation. Since the law of the State is the ultimate legal authority for New Hampshire, it would be reasonable to declare this section of the contract illegal. Article 25: Separability discusses that if one article is found to be illegal or invalid the remainder of the contract is still in effect. There is also a due process guarantee in the U.S. Constitution, as well as most state Constitutions that may make this provision of the CBA a violation of citizen's rights.

The article goes on to describe in detail the time restrictions for each action at each level of discipline. It is important to note that in each and every section it calls for action to be initiated by the employees "immediate supervisor or other supervisor." There is nothing limiting this supervisory capacity to members of the department. In fact, the agreement clearly articulates in Article one that the agreement is with the Town and in article four it establishes the rights of the Town to ensure efficiency of operations.

Written warnings and suspensions are covered in number five of this article and here we see for the first time a call for discipline to be issued to the employee by the Chief. While this article clearly shows the Chief as the ultimate authority over police discipline, this should not be interpreted as restrictive. The Chief of police is traditionally an appointed position. The person holding this office usually serves at the pleasure of the Town with an employment contract being customary. Provisions for separation from this authority role are usually clear in this contract. If the chief is shown to be incompetent of derelict to matters of importance to the community, he or she is often excused from the role of chief. This causes union contracts to be written assuming the chief will responsibly be leading police operations. It is uncommon, if not non-existent, for a CBA to clearly state that if the chief is failing to act, that the Town may assert its authority as established under management rights (article four of this contract). Whenever the chief is mentioned as an authoritative role, it should be assumed no one with lesser authority than the chief may make these decisions. The Town, being in a higher position of



authority would be allowed to step in and fill the role of the chief if the chief is failing to act as required to protect the integrity of operations.

In summary article 11 establishes procedures to be followed for disciplinary issues. There is nothing in this article that would disallow the Town from following these procedures and conducting their own investigation if the chief was failing to take necessary action.

## Summary

It is unclear as to who was in attendance for the negotiations of this union contract; however, only the signatures of the union president and the town manager appear on the document. It is customary for CBAs to be agreed upon by a representation of the membership, as well as a representation of town administration and legal counsel for both sides. In matters such as this, where questions arise about the details of the language of the contract, often the spirit of the agreement is called upon to settle such issues.

It would be hard to believe that town administration would willfully enter into a contract that removed their ability to act against employees acting in a way to bring discredit to the town. It would also be hard to believe the town would agree that criminal behavior or civil rights violations perpetrated by their officers should be ignored if members of the public do not bring them to light within a six-month time period from the occurrence of the event. Due to the restrictive language which excuses the police agency from initiating an investigation into an officer's conduct if it is not reported within six months of occurrence, article 11 of the contract between the Town of Salem, New Hampshire and the Salem Police Relief should be considered illegal and, therefore, readdressed.

# Concerns with Salem Public Administrators Association CBA

## Article 13: Discipline

This article opens with a statement that reads "an employee may be disciplined and/or terminated for misbehavior while on duty if there is found to be proper reasonable cause for such action. An employee may be disciplined and/or terminated for misbehavior while off duty only if this behavior has a severe and demonstrated impact on the employee's ability to perform his/her duties and responsibilities." This is an uncommon distinction between on-duty and off-duty behavior and appears to be unreasonably restrictive to the Town's ability to discipline persons covered by this bargaining agreement for off-duty



behavior. While this contract covers many executive level civilian employees, it also covers member of high rank in both the police and fire departments. Sworn police positions, unlike the civilian positions covered, carry a burden of the individual holding the office to conduct him/herself in a certain manner both on and off duty. The fact that this contract limits the ability of the Town to only address off-duty behavior that has a severe and demonstrated impact on the employee's ability to perform his/her duties and responsibilities is concerning due to the sensitive nature of police work and the ethical standards of the profession.

Number nine of this article states, "The town of Salem shall not discipline or discharge employees who come under this agreement except for cause as set forth in this Article. This statement simply speaks to cause and not to the process of investigating allegations. While this article goes on to state that an employee who disputes discipline or discharge are entitled to follow the Grievance Procedure, this does not restrict the process. This article offers steps to follow for discipline but allows the Town the right to assess discipline on the merits of the offense and initiate discipline at any step of the process.

## Article 19: Management Rights

This article agrees that the rights and responsibilities of the Town that are not specifically articulated within the agreement are retained in the sole discretion of the Town. In subsection "a" of paragraph one it clearly states the Town has "the right to direct employees… to retain employees in positions and to suspend, demote, discharge or take other disciplinary actions against an employee for proper and just cause." This statement clearly allows the Town to initiate an investigation that may result in discipline against any employee as long as it is done for proper and just cause. While this action may be subject to other provisions of this agreement (including grievance and arbitration) this should not be interpreted as limiting to the Town's ability to investigate allegations against the police.

## Article 23: Public Safety Officer Benefits

This article discusses benefits of certain members of this contract that are not afforded to other members of the Union. It discusses issues such as uniform allowance, holiday pay, leave and injured on duty benefits. While this section extends benefits to members of the public safety units covered by this contract, there is no discussion of any differences in code of conduct or other provisions that might be fitting in a subsection specifically designed to separate public safety officers and clarify the differences for this subset of employee's purposes of the contract.




Drummond Woodsum

## Summary

This contract has some significant differences in dealing with police employees than the contract between Salem Police Relief Local #22. Most notably, this contract does not have the six-month restriction for initiation of an investigation that may be brought to the agency in a delayed report from members of the public.  However, Kroll was informed that it is an acceptable past practice to apply it based on a past agreement. A matter of concern is the restriction that off-duty behavior be subject to discipline of discharge "only if this behavior has a severe and demonstrated impact on the employee's ability to perform his/her duties and responsibilities." For police professionals, especially those holding positions of rank and authority within a police organization, this provision is dangerously restrictive and offers unreasonable sheltering of potentially compromising off-duty behavior to be protected from discipline if a direct correlation to impact on job performance cannot be argued. This is contradictory to national best practices which hold law enforcement officers to a higher standard of behavior both on and off-duty due to the moral and ethical standards of the profession. It is also in conflict with the departmental policy, which will be discussed in depth later in this report.



# 3. Review of Departmental Policies

An incomplete sampling of general orders was given for review. The general orders all have an issue date and a date of review on the face of the document. It is unable to be determined if these reviews are being conducted as required. Since some documents call for a review in years that have already passed, it is assumed that if a review was in fact done that the date of review would have been updated. The summaries offered below indicate if the policy appears to have been updated as required (current) or if it is overdue for review (past due).

## General Order 10-3: Policy Review

This general order was issued on October 9, 2015 and is up for review in 2018 (current). In summary this order calls for the creation of a policy review committee to ensure policies both have input from all levels of the agency as well as being subject to review at regular intervals. This general order is in line with national best practices although no proof that the policy is being followed was offered as part of the documentation received for review.

## General Order 10-5: Firearms Discharge Review Board

This general order was issued on October 9, 2015 and was up for review in 2017 (past due). It establishes a review board and a process for reviewing all use of force incidents including, but not limited to, discharge of a firearm. The board is tasked with reviewing all qualifying incidents (any use of force including hands on techniques, OC taser and incidents involving weapons display or discharge). It calls for the completion of a "Use of Force Report" documenting each use of force incident and an annual review of said incidents by the board. This policy only addresses the process and responsibility of the review board. There is no mention of early warning systems to identify problem behaviour or the responsibilities of the supervisor doing the real time review of the incident. The findings of the board are forwarded to the Chief of Police for determination of action. Use of Force is covered in General Order 35-1, which is referenced in this general order.

## General Order 10-6: Inspection Process

This general order was issued on October 9, 2015 and was up for review in 2017 (past due). This general order lists responsibilities for the different levels of police administration reference both line and staff inspections. This order calls for both announced and unannounced inspections, but in contrast



Drummond Woodsum

with national best practices, does not specify what intervals these inspections should be done at (monthly, quarterly, annually). Additionally, the form attached for use is a non-specific narrative asking for efficient and non-efficient areas. There is no mention of checking for required equipment, cleanliness of the officer's firearm, wearing of body armour or other areas that are commonly listed on evaluations to ensure the evaluator is doing a thorough and consistent job with each and every employee. The current form allows for discrepancy in what each supervisor might be looking for and allows areas that need to specifically be observed to potentially be overlooked.

## General Order 10-7: Police Vehicle Accident Review Board

This general order was issued on October 9, 2015 and has a review date of 2016 (past due). This general order establishes an accident review board and describes a points system used to determine a course of action as a result of the crashes. This policy states this board will review all accidents involving police vehicles. It is established that the board will have meetings, but no regular intervals or time frame after the occurrence of an accident is given. Clarification on how expediently after an accident occurs a review should be conducted is in order.

## General Order 15-3: Officer Replacement/Work Assignment

This general order is dated October 19, 2017 with the review date of 2019 (current). This general order establishes very specific process for overtime assignments and outside details. This topic is usually subject to terms established in a collective bargaining agreement and it is common to see this detail in the negotiated contract and a referral in policy to the bargaining agreement. Here the general order offers the specific guidelines for filling assignments. Violation of this policy seems to have its own set of penalties built into the general order. This leads one to wonder if an employee violating this policy is excused from other disciplinary action and is only subject to the penalties established in this order or if they are subject to these penalties as well as other disciplinary action. It is uncommon to see a policy with penalties for violation of policy built into the general order as usually police are expected to follow general orders and violations of orders are unacceptable.

## General Order 15-9: Swaps

This order was issued on October 9, 2015 and is up for review in 2018 (current). The order established a procedure for officers engaging in a shift swap. The swap needs supervisory approval.



## General Order 25-1: Police Conduct

This general order is dated November 6, 2015 and calls for a yearly review on the face of the document (past due). In addition to the two-page policy, a seventeen-page attachment (Attachment A) is included with this document. The comprehensive attachment clearly covers both on-duty and off-duty behaviour with some specifications made for differences between the two. It can be assumed that the provisions that do not specifically state the difference of if the behaviour is on-duty or off-duty covers behaviors in both situations (example; there are clear specifications for alcohol consumption as related to on-duty vs. off-duty compared to the statement about criminal conduct being prohibited which does not make a specification to duty status). The Code of Conduct is routinely the standard for judging behavior. While these policies cannot be all inclusive in their list of inappropriate behaviors, they are a good completion of guidelines for personnel to follow and offer a general idea of what behaviors are considered in conflict with acceptable police conduct. This policy also contains a preamble explaining the articles are not all-inclusive of prohibited behaviour. Additionally, it contains the Law Enforcement Code of Ethics as part of the document which calls police to a certain standard of conduct both in their personal and official life.

## General Order 35-1: Use of Force

This general order was issued on November 19, 2017 and is due for review in 2019 (current). A contradiction is present in that the seventh paragraph under policy calls for a "yearly" review of this policy as part of the "Use of Force training review". It is unclear why that annual review would not be the standard for the policy review rather than to have a two-year review called for on the heading of the document with a mention of an annual review on the second page. This document goes on to explain the different levels of force that can be used by an officer and situations where the force would be acceptable and also unacceptable. There is no mention of completing a use of force report in the deadly force section of this general order although it is mentioned in Section VIII: Use of Force Report that a use of force report will be generated whenever a firearm is discharged on-duty outside the firing range. A use of force report is called for in both the OC and TASER sections of this general order. A use of force report is not required under the "Hard Hand Control" section discussing strikes or the Intermediate Force section that discusses the use of the ASP Baton. A use of force report is also not required under the Drag Stabilized 12 Gauge Bean Bag Round. Despite the use of force report not being specifically called for when discussing these less lethal weapon usage, Section VIII: Use of Force Report does state, "when a non-lethal weapon (including a police canine) is used on a subject or when any use of force results in an injury or death". It is not in line with national best practices to only require



a use of force report when force used results in injury or death. While this general order does specifically require a use of force report for the firing of a firearm, the use of OC spray and the use of a TASER, there are several other incidents that would be considered use of force incidents by any reasonable standard in which this report does not require use of force reporting to occur. These include use of hands on tactics (including strikes, holds and takedowns), any use of force used to restrain people or take people into custody, Bean Bag Gun Deployment, ASP strikes and compliance holds and any other force applied that may not be covered in the specifications of this policy. Imposing a standard of reporting use of force only when injury or death occurs is irresponsible and potentially dangerous. It also prohibits the agency from tracking which officers may be involved in the low-level force incidents that may require training or intervention. Often identifying a pattern of behaviour with use of force incidents that would fall outside the scope of what is required to be reported by this general order is where the agency would have the potential to identify concerning behaviors before they turn into excessive force problems for the agency. Numbers that appear to be CALEA standards are placed throughout this general order. There is no reference to CALEA anywhere in the document, but the numbering system appears to coincide with current CALEA standards.

*When interviewed Captain Wagner stated that any use of force other than the application of handcuffs required a report. However, that is not clear in the policy.

## General Order 45-2: Property Management & Control

This general order was issued on November 30, 2015 and has a review date of 2018 (current). This general order establishes procedures for the acceptance, documentation and control of all properties held by the Salem Police Department. The persons responsible for the evidence as well as a control system for audits is also explained in this general order. This document again shows numeric indications throughout the body for the document that appear to align with CALEA standards. Under the Chief's signature on the last page of the document before the attachment CALEA standards are referenced. This is the first policy observed by this auditor to make any formal reference to CALEA, this includes the review of documents with a more recent issue date than 2015.

## General Order 65-3: Internal Investigations & Review

This general order was issues on October 19, 2017 with a review date of 2020 (current). The policy section of this document opens with a statement that "all complaints will be accepted and documented". It goes on to read that complaints will be fully investigated in an open and fair manner. These statements are in direct contradiction with the collective bargaining agreement with Salem Police Relief



Drummond Woodsum

Local #22 which disallows for any investigation of complaints that did not occur within the last six months. Under section V: Supervisory Responsibilities the last statement of the first paragraph stated that a supervisor's explanation shall not serve to dissuade or discourage a complaint from being filed. This appears to be in contradiction with the formal complaint form that indicates the complainant can be charged with a crime if the allegations are found to be untrue. The next paragraph goes on to task the supervisor with the responsibility of documenting the complaint if the person making the complaint does not want to commit the complaint to writing. Section VII: Internal Complaint Investigation closes with the statement, "All collective bargaining agreements shall be adhered to". This would disqualify any complaints delayed for six months or more from being investigated by the agency. This document fails to include" Attachment A" which is referenced as the "Complaint Intake Form" although other attachments are included, none of them bearing a title of Complaint Intake Form or Attachment A. The policy also makes no mention to any training required by members of the supervisory staff tasked with conducting internal investigations. Due to the sensitive nature of these investigations it is national best practice to require training of employees who will be responsible for conducting internal investigations.

## General Order 65-7: Disciplinary Procedures

This general order was issued on March 14, 2018 and has a review date of 2020 (current). This general order explains definitions and general guidelines for disciplinary procedures and is generally reflective of the disciplinary procedures seen in the collective bargaining agreements. The document closes with a concerning statement that reads, "(A)ll internal investigations or informal inquiries and related paperwork without a finding of "sustained" shall be removed from all files and destroyed after a period of one (1) year". This statement contradicts previous policy that stated files will be kept by the Chief. Pervious policy (G.O. 65-3) disallows any complaint documentation with a finding other than sustained to be placed in personnel files. It is unknown what files these complaints with the other investigative dispositions may be kept if they are disallowed in personnel files. It is concerning that this policy might indicate than citizen complaints that are not sustained might be destroyed after one year. If this is occurring, it is not in line with national best practice and is potentially concerning behaviour as the Chief has ultimate responsibility over the contents of these investigations and they should be available for reference in the event additional information arises or events of a similar nature occur in the future. CALEA standards are referenced throughout this document and CALEA standards are referenced at the end of the document after the Chief's signature.



Drummond Woodsum

## General Order 00: Situations Involving Family and Friends

There is currently no policy that prohibits or outlines how officers should or should not respond to situations involving family or friends.

Officers will often find themselves in a situation involving a family member or friend. As a best practice, most departments have guidelines as to how best to respond, including prohibitions from intervening unless an emergency exists as well as requirements to immediately notify a supervisor. These policies also address requirements for or best practices when engaging with off-duty officers, which also often require a higher ranking supervisor being engaged immediately.

There were several instances reviewed by Kroll in which such a general order may have benefited the Salem PD.



# 4. Retention of Internal Affairs Investigative Files

Kroll requested and was provided by Salem PD administration case files for internal affairs investigations, which they described as comprehensive and complete. However, Kroll was previously informed by Chief Donovan that department policy called for the destruction of any and all complaints and documentation pertaining to investigations that resulted in not sustained complaints. Kroll was further informed that prior to receiving the documents, Chief Donovan reviewed various files and removed documents, seemingly to comply with the CBA. The CBA, however, mandates that documents be removed from personnel files only if requested by the employee. There is no purging requirement detailed in the CBA.

Despite indicating otherwise, Kroll received not only complaints where violations were sustained but also documents from several unfounded and not sustained complaints, which had, in fact, been maintained by the department for informational purposes (despite Kroll being told that the department does not maintain these complaints after a not sustained or unfounded ruling is administered).

Kroll notes that the department has recently started using the software program, Guardian Foundry System ("Guardian"), which tracks complaints, as well as other factors, in an effort to identify and flag concerns pertaining to officers. Although the department has had access to Guardian for some time, officers only recently began utilizing the software. Guardian is considered best practice within law enforcement and, in Kroll's experience, can effectively track internal affairs complaints and, therefore, aid administration in providing support to officers via training, additional supervision, counselling or other means. While Kroll was concerned that the department's implementation of Guardian may lack effectiveness based on Chief Donovan's interpretation of the CBA, Captain Dolan stated in his interview that he had been serving as point person for the implementation of the Guardian system and was fully aware of its benefits specific to tracking formal IA investigation and informal inquiries:

> MR. LINSKEY: So, the -- you'd get complaints from people who said hey, I got a ticket, I -- I wasn't doing forty-five I was doing thirty-eight, you know, he was wrong and that's not a complaint against officers' action and activities, that's -- that's for the Court to decide, that wouldn't be an IAD complaint, you'd -- you'd let the person know that, you know, whether the ticket is fair or justified, the -- the right forum for that is to go to Court, state your case, but it's not something the department needs to get involved with.



CAPTAIN DOLAN: Well correct -- yeah, that -- that -- I think that's a procedural, that that's -- that's, you know, the suspects or the violator or the -- or the operator's, you know, opinion and that -- that's for him to go in front of a Judge and say no, I wasn't -- I wasn't doing it and it's for the -- for the Judge to decide the facts.

MR. LINSKEY: And if it's a -- I know you guys are now tracking complaints, but that's not something that would go into Guardian, that's --

CAPTAIN DOLAN: That would not. No, that would not.

MR. LINSKEY: Now if the same thing occurred, hey the officer gave me a ticket, not only was I not doing forty-five but he called me, you know, the F word, he called me this word, I don't think his -- he was professional in the way he treated me, and in some of those cases you're able to get the person's side of the story, you talk to the officer, get their side of the story, somewhere in between you figure out whether, you know, the officer denies it categorically or he says yeah, you know what, I might have said something, but not quite that, you know, let me give you my version of it, and some cases you're able to work it out with the person on the phone and say look it, I spoke with the officer, you know, he -- he apologizes for saying that or I've talked to him about not -- you know, not shining the light in somebody's eyes when they have a medical -- whatever their -- and -- and sometimes we're able to work that out on the phone where they don't want to file a formal complaint, they feel satisfied that someone at least listened to their concern.

CAPTAIN DOLAN: Well, we have -- we have on Guardian we have a citizen's complaint which is outside of the IAD, so -- so it is one of those.

MR. LINSKEY: So -- so if --

CAPTAIN DOLAN: So -- so we do have that category so in the intention of when we implemented it, it is those because I'm sure in -- in your experience you have guys, and some active guys are going to have more just because they're active --

MR. LINSKEY: Sure.

CAPTAIN DOLAN: -- and then there are guys that for whatever reason that their tone is not soft or -- or they get those and -- and it could just be a matter of training, could be a matter of -- of what we do down the road with him, but the intention of, when we implemented Guardian was to track those and if there's a guy that keeps coming up because we, you know, we have guys that have -- and they've been addressed in their annual performance evaluations, there are guys that generate more. They're not swearing at them it's just the -- the matter in which they are talking to them that comes off -- that people -- that turns people off. So, that is our intention with the citizen's



*complaint entry on that and that it would be on there and then at some point that could – that will trigger an early intervention if there's -- there's so many of those.*

*MR. LINSKEY: Okay. So, that would be, if there was unprofessional conduct that would be something that would be referred to Guardian now, previously, before Guardian, if you spoke with the officer, spoke with the operator, and you spoke to the operator and said, you know what, I've -- I've talked to him, I've told him, you know, he's got to have patience, he's got to use, you know, shouldn't use language like that. By the way, I just want to let you know, he'd worked eighteen hours, he'd been over -- extended his tour during the snow emergency, so he was a little tired and probably frustrated easy, I apologize on behalf of the PD. If that citizen was happy, then that's not -- we don't have to go any further with hat, it's kind of taken care of at a management, supervisory level, and now you would make a notation in Guardian, but previously before Guardian, it would just kind of be known to you and the other supervisors that hey, this is the second or third time we've had to talk -- talk to Dan about the way in which he talks to people during traffic stops.*

*CAPTAIN DOLAN: There -- there was -- there was no central location for it --*

*MR. LINSKEY: Got it.*

*CAPTAIN DOLAN: -- so it either stayed with -- on their shift, it either stayed on with that, it could have just been that that supervisor and then when -- because when we do performance evaluations we send out a -- an email to all departments, anyone that would have contact with him, hey, I'm doing an eval on Joel Dolan, any input, you know, and a supervisor could say well, you know, I'm working the desk and I get -- I get a lot of phone calls when, you know, he's –*

The IA case files, which were described to Kroll as complete, also presented several concerns. Although some of the case files contained large amounts of detail and information, many files contained only a few documents. None of the files included Garrity Rights[4] ("Garrity") forms, transcripts/audio recordings of officer interviews or photographs/visual aids, and as such, appear to be incomplete. Many did not contain notices to officers of the complaints filed against them, which would be in violation of the CBA, as well as in opposition to law enforcement best practices.

---

[4] Garrity Rights apply to the right of a public employee not to be compelled to incriminate themselves by their employer.  These rights are based on the 1967 United States Supreme Court decision *Garrity v. New Jersey*.  Garrity Rights apply only to public employees, because they are employed by the government itself.



Drummond Woodsum

Kroll's interview with Captain Dolan notes, however, that his investigations were, in fact, much more in-depth than detailed in the case files. Captain Dolan stated that he records all of his interviews and provides all officers with Garrity forms before commencing an investigation. Sergeant Verrocchi stated that his officers only give statements after signing Garrity forms and that he also records the interviews for the union.

These incomplete, and seemingly uncomprehensive, files present a major concern, based on Kroll's opinion. Case files pertaining to IA investigations must to be maintained in their entirety to properly protect the town, police department, as well as officers, against future complaints and/or litigation. Failure to maintain complete case files may also be in violation of the New Hampshire Attorney General's regulations.

While the comprehensiveness of these case files is certainly a concern, even more concerning to Kroll was the lack of clarity as to what records are currently maintained by the Salem PD, and therefore, what information was available to Kroll. When initially interviewed by Kroll, Chief Donovan stated that the documents encompassed all records maintained by the department for the past five years. However, when presented with documents that included unfounded and not sustained complaints, the chief stated that such documents should have been destroyed and may have been inadvertently stored in a previous supervisor's file cabinet. He stated that the records were provided to Kroll as a courtesy and as an example of what the file may look like should they be regularly stored. Chief Donovan stated the following in his interview with Kroll:

> MR. LINSKEY: Is there any documentation that says that the person was satisfied with it, is there something they sign that says, you know, I met with -- today Lieutenant Jones, met with Linskey and Shanahan, we discussed the issues, after having a conversation I'm fine with the outcome and --
> CHIEF DONOVAN: We don't but even if there was, technically we don't keep those, like that exonerated, that would not have been kept normally.
> MR. LINSKEY: What do you mean it -- so due to CBA practices it's not kept?
> CHIEF DONOVAN: CBA, if -- if there Is not a finding of sustained they don't get kept.
> MR. LINSKEY: Is it they don't get kept at all or they don't get kept in the officer's personnel file?
> CHIEF DONOVAN: No, they don't -- they don't get kept, they're done, they're -- they're gone as if they don't exist.



> MR. LINSKEY: So if there's a finding of exonerated, not sustained, the finding of exonerated then right away it gets shredded?
>
> CHIEF DONOVAN: No -- well yeah, technically it's supposed to get shredded right away. I'll normally do them at the end of the year.

When presented with the 29 case files over the prior five years, which had been provided to Kroll, and asked about their accuracy, Chief Donovan stated the following:

> MR. LINSKEY: Is it possible those numbers aren't accurate based on the CBA that if people make a complaint then it's to find as not a -- not sustained or unfounded that the documents go away, that we don't have an accurate -- remember because that --
>
> CHIEF DONOVAN: Oh yeah, because the only ones you'll have --
>
> MR. LINSKEY: -- that number seems --
>
> CHIEF DONOVAN -- you'll only have the sustained, but the numbers are -- the numbers really aren't much higher.
>
> MR. LINSKEY: What -- some of these aren't sustained, some of these are unfounded, un-sustained.
>
> CHIEF DONOVAN: Well Rob threw some in there just so you can see --
>
> MR. LINSKEY: Okay.
>
> CHIEF DONOVAN: -- what they look like and how we do them, so we included some of the stuff that we normally wouldn't have had in there, and we had actually looked for some of it because the way the CBA reads if they're not sustains we don't keep them.
>
> MR. LINSKEY: And the thought is the -- the town does not keep any of those documents, they get destroyed in accordance with the CBA if it's a not sustained or unfounded. So would you agree with me that seven citizens' complaints during a five year time frame during the advent of the cellphone videos and the recent, you know, pressure on law enforcement is – is a low number?
>
> CHIEF DONOVAN: Well of course it's low, but we don't have those kind of issues here. This isn't Boston. It's amazing what you get here, I mean, most of the people are very cooperative, we rarely run into people that are not cooperative with us. These guys are mostly younger guys, they're not -- they're not hot heads, they're not pushy, they're very polite, it's -- I think we just don't get a lot.



Drummond Woodsum

However, Chief Donovan's interpretation – and the Salem PD's practice – of this records retention practice is in direct conflict with direction provided in a memorandum issued to all New Hampshire police departments by the New Hampshire Attorney General's Office on March 21, 2017:

> LAW ENFORCEMENT MEMORANDUM
>
> To:        All New Hampshire Law Enforcement Agencies / All County Attorneys
> From:    Joseph A. Foster, Attorney General
> RE:        The Exculpatory Evidence Protocol and Schedule
> DATE:    March 21, 2017
>
> All complaints of lack of credibility, excessive force, failure to comply with legal procedures, and mental illness or instability must remain in an officer's personnel file, until a determination is made that the complaint is unfounded, exonerated, not sustained or sustained. Any complaints, determined to be sustained (meaning the evidence proved the allegations true) or not sustained (meaning the evidence is insufficient to determine whether the allegation is true or false) must be preserved in the officer's personnel file throughout the officer's career and retirement, unless the finding is later overturned.

When Deputy Chief Morin was asked about the retention of internal affairs case files, specific to how Guardian could be more effective if information was maintained on only sustained complaints, he responded:

> *MS. SHANAHAN: So that's how an I – that's how an internal inquiry is supposed to happen, how it's supposed to play out in terms of investigative – how intake, investigation, response, and conclusion.*
> *MR. LINSKEY: And when is it purged from Guardian, or is it ever purged form Guardian?*
> *DEPUTY CHIEF MORIN: It will not – it won't be purged from Guardian, it – it stays in Guardian, but –*
> *MR. LINSKEY: But six months -- so this is -- this is a complaint, --*
> *DEPUTY CHIEF MORIN: Yup.*
> *MR. LINSKEY: -- no discipline's been found --*
> *DEPUTY CHIEF MORIN: No -- well, it's not --*
> *MR. LINSKEY: -- by CBA. Isn't it --*



DEPUTY CHIEF MORIN: It's not a complaint it's an informal inquiry because she --

MR. LINSKEY: Okay.

DEPUTY CHIEF MORIN: -- writes right in there, I don't wish to go on with the formal complaint, so it was an informal inquiry.

MR. LINSKEY: So informal inquiries can be kept past the the time of the deletion process for the CBA?

DEPUTY CHIEF MORIN: Right. Now, if she comes back eight months from now, per the CBA, --

MR. LINSKEY: Yup.

DEPUTY CHIEF MORIN: -- okay? It's no good.

MR. LINSKEY: But I think -- these -- you can keep these documents as long as you want?

DEPUTY CHIEF MORIN: Keep that document. Now, if a letter of counseling, --

MR. LINSKEY: If -- if --

DEPUTY CHIEF MORIN: -- verbal warning --

MR. LINSKEY: If a verbal warning went then it -- it goes six months, no is --

DEPUTY CHIEF MORIN: No, two years.

MR. LINSKEY: -- is it a year? Two years, okay.

DEPUTY CHIEF MORIN: Two years.

MR. LINSKEY: If nothing was sustained, if everything was, you know, Linskey did his job, nothing -- I'm -- I'm exonerated --

DEPUTY CHIEF MORIN: Yeah.

MR. LINSKEY: -- from all of it, then it has to go away; right?

DEPUTY CHIEF MORIN: It's supposed to go away.

MR. LINSKEY: Even this; even an informal?

DEPUTY CHIEF MORIN: It goes away in the sense that it no longer exists in the personnel file at HR.

MR. LINSKEY: Your personnel file at HR?

DEPUTY CHIEF MORIN: Right.

MR. LINSKEY: Okay. But the PD will still keep the record?

DEPUTY CHIEF MORIN: Yes.

MR. LINSKEY: Okay.



Drummond Woodsum

*DEPUTY CHIEF MORIN: And though we gave you that, we're maintaining, and there'll be a Court decision very soon[5], --*

*MR. LINSKEY: Sure.*

*DEPUTY CHIEF MORIN: -- that it always exists in the Chief's -- under lock and key. It exists there, but any discipline that by contract comes out is removed from that file, from their personnel file out -- that file it stays, their personnel --*

*MR. LINSKEY: It stays in the Chief's file --*

*DEPUTY CHIEF MORIN: Personnel file --*

*MR. LINSKEY: -- comes out of their personnel file, comes out of the city hall file.*

*DEPUTY CHIEF MORIN: Correct.*

*MR. LINSKEY: But the document stays in the Chief's file.*

*DEPUTY CHIEF MORIN: The document always exists.*

*MR. LINSKEY: Okay,*

*DEPUTY CHIEF MORIN: It's -- it's kind of like a case hat's been -- that somebody has annulled; okay? The charges go away but it still -- the event still happened.*

*MR. LINSKEY: Got it.*

*DEPUTY CHIEF MORIN: So it's the same thing.*

*MR. LINSKEY: Okay. And if he had six more complaints of the same behavior you could at least, for your own mindset, say you know what, --*

*DEPUTY CHIEF MORIN: Correct*

Deputy Chief Morin's statements are consistent with the Salem PD's IA procedure, as provided to Kroll, and would be considered in compliance with the Attorney General's direction concerning the Laurie decision. His statement regarding Guardian's maintaining all such information is keeping with the best utilization of the program. However, Kroll was sent a newly-revised policy by the Salem PD (#G.O. 65-7.G.O.), which supersedes the previous policy (#G.O. 65-3). This newly-revised policy states that an information log detailing all complaints will, in fact, be purged from Guardian. Still, the deputy chief's description of a master file under the chief's control was in direct conflict with Chief Donovan's statements.

---

[5] The Deputy Chief was referring to a court action that is occurring in another jurisdiction regarding whether the Town has a right of access to the files that were provided to Kroll.



Kroll requested a second interview to clarify the actual procedure and determine if additional documents might exist in a file under the chief's control. As reported in a second interview with Chief Donovan:

> MR. LINSKEY: So we've gone through the process of IA's, spoke to different people who have done them, the stuff we had is that the -- I know you said initially that some of it came from a former, I don't know if it was a captain of a deputy chief, who used to keep files that he should have not kept but you gave them to us to show us a couple instances of informals.
>
> CHIEF DONOVAN: Oh yeah, I think -- I think the informals. Yeah, he -- usually with the informals, especially if they were not sustained, he shouldn't have hung on to them, but he did.
>
> MR. LINSKEY: Okay.
>
> CHIEF DONOVAN: You know, I'm sure he didn't -- hadn't do any -- anything nefarious, he just I think would stick them in a file cabinet, not cleaning out (inaudible at 00:37, low audio) cleans the cabinet out, but yeah.
>
> MR. LINSKEY: The IA files we got, for those cases we talked about, whether it was the ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓, or the ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ or any of that, do we have the whole IA file, are there audio tapes, do they -- do they audio tape officers, are there forms that they fill out or is that -- the things we have is the whole file?
>
> CHIEF DONOVAN: Yeah, we don't tape -- though occasion if we have to download something▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ or we'll download stuff from dispatch coming off of IMC, we'll download it, but yeah, usually the whole -- if there's tapes or any CDS or anything with it they'd normally all be together and with the package.
>
> MR. LINSKEY: Okay. So, none of those cases that we got had tapes or CDS or anything?
>
> CHIEF DONOVAN: If they weren't in there then I didn't have them, no.
>
> MR. LINSKEY: Okay.
>
> CHIEF DONOVAN: Sometimes -- I would think they all -- the whole package should come over, but every once in a while I will have to go back after somebody and say where's the tapes or where's the -- the CDS, as a matter of fact I had one right here the other day, I might have already put it in -- but they should turn a whole package over, all the material, over to me first and then of course if it comes not sustained then all of it's gone.



MR. LINSKEY: Not sustained it goes?

CHIEF DONOVAN: Right.

MR. LINSKEY: Does -- do -- do you keep anything just, and I'm not talking -- personnel files or main file, is there a file that, you know, everything that came in is at least kept there for, I'm going to screw up the name, I -- I call it Giglio and Brady purposes, but I know it's -- it's Laurie, Laurie up here, is there a main file for, you know, it's not sustained but there were accusations of corruption, whatever, that you would -- you'd be required to turn over at some point?

CHIEF DONOVAN: Well, no there's -- if you read Laurie, Laurie only accepts not sustains or if it's not sustained they don't accept it, they only want sustained incidences.

MR. LINSKEY: Okay.

CHIEF DONOVAN: So yeah, if we have sustained incidences out there, we've had people we've had to put on the Laurie list, the entire package can go up to them, but they could also have maybe another one or two that were not sustains, that package -- those are gone so they wouldn't go to them. Laurie is very careful when they wrote Laurie, to that, they would only use incidences of sustained findings, they wouldn't use incidents that weren't because basically they're allegations but if -- if they can't be proven I don't think they want to hold that against an officer. I think the purpose of Laurie was just to make sure that if there were sustained incidents against an officer that those were provided to the Feds.

MR. LINSKEY: What do you do, Chief, to track, you know, Linskey's had nine instances of somebody saying he threw out the F bomb and, you know, is there no way of tracking that, is there no way of keeping those reports to say, okay look, although they were not sustained, you know, this is the ninth time we've had --

CHIEF DONOVAN: We never had that, we don't get a lot of repeats, and again, we're a small agency, pretty much know anybody that has more than one or two we're going to know who they are.

MR. LINSKEY: Okay.

CHIEF DONOVAN: The vast majority of guys in -- in the organization don't get any complaints at all and if you do have somebody who's, like, a repeat offender you know exactly who that person is and not -- in -- in those particular cases we would know who they were, and they never even make it that far. If we start to see a pattern of some kind of misconduct, we would jump on it right away, you know, even -- even if we couldn't -- say it was a he said, she said, we couldn't prove it one way conclusively, we would still already start working on that officer with retraining and we'd start maybe



*putting him under a little more direct supervision, you know, we might even put him on a PIP. We do try to nip it in the butt before he gets too high, so we don't -- we don't have people who have I mean, there was only one individual I can think of who pretty much had, like, several instances.*

Kroll notes that Chief Donovan's statement is not in alignment with the department's IA policy, as provided to Kroll, and appears to include a misunderstanding of the Attorney General's guidance regarding Laurie. It also is in direct conflict with Deputy Chief Morin's understanding and explanation of the current operations of the department.

Kroll further notes that even under the assumption that Kroll was only supposed to be provided with sustained complaints, there seems to be case files missing. In one of the cases reviewed, Internal Investigation (formal) IA #02-16 Officer █, a review of the formal investigation shows an investigation conducted ████████████████ on ██████████ referencing the conduct of Officer █ on a call for service. There is the statement, "Officer █ had been disciplined on four other occasions in the past year," included in the findings section of this incident. Kroll was not provided any of those files.



# 5. Review of Internal Affairs Investigations

Retired Deputy Chief Roy Bethge and Dr. Laura King conducted an independent review of the IA investigative files as provided to Kroll. Their analysis is based on a review of 29 separate complaints. Sixteen of these complaints were generated internally, and all resulted in sustained charges. Thirteen complaints were generated from outside the department, and five resulted in sustained charges.

As noted, the case files contained a significant lack of documentation and often appeared to be incomplete. However, interviews revealed, in some instances, that additional investigative efforts had, in fact, been conducted without proper documentation either included in the case file or provided to Kroll.

Additionally, many of the officers tasked with conducting IA investigations had no formal training to conduct such investigations. Captain Dolan noted that he and Detective Lieutenant Fitzgerald had received formal training:

> MR. LINSKEY: And you had formal training on IAD investigations.
> CAPTAIN DOLAN: I did, not what -- I had done some before but I -- then I saw it I'm like, I'm doing IAs it's probably something I should be trained in, and then myself and Detective Lieutenant Fitzgerald went to IA training.

However, Captain Michael Wagner stated in his interview that, although he is often tasked with conducting IA investigations, he has never received any specialized training:

> MR. LINSKEY: Okay. Any specialized training into internal affairs investigations when you came into the position where you started to get involved with them?
> CAPTAIN WAGNER: Nope, I have not gone to a formal IA course yet, that's something that we're waiting to come up, that I'm definitely going to be going to, but I have not gone to a formal internal affairs course yet.

As such, there is a disconnect between the department's written policies and the practice of those tasked with receiving and investigating complaints. Kroll's interviews confirmed that the practice is not in alignment with the department's policies and is not in keeping with law enforcement best practices. Further, the department is in serious need of formalized training in conducting such investigations, with officers even acknowledging the need and desire for such training.



Drummond Woodsum

**Internal Investigation (informal inquiry upgraded to formal) IA ███: Officer A**

A review of this IA investigation shows an informal inquiry being upgraded to a formal investigation due to preliminary findings. This investigation was conducted by ████████████. On ████████████, Officer A was found "passed out" in the report room of the Salem PD while on duty. It was later learned that Officer A had consumed prescription medication resulting in his inability to stay awake. An Employee Assistance Program ("EAP") intervention was immediately initiated as the investigation into Officer A's conduct began. Through the investigation, Officer A was found to be abusing prescription medication and was impaired while on duty. Officer A's failure to notify his supervisors of his prescribed medication combined with his being impaired while on duty resulted in a recommendation of termination of employment. This packet shows a complete effort with documentation of statements from witnesses, relevant policy / performance evaluations and supplemental documentation. References to a "fitness for duty" evaluation in ████████ and a prior IA investigation (IA #04-10) from ████████████, which resulted in a 15-calendar day suspension without pay and a last chance agreement, are included. The full details of this ████ investigation were not available for review. On ████████████, Officer A submitted a letter of resignation to the chief and Town of Salem. This letter was not accepted by the Town and the internal investigation moved forward. Officer A did not show up for the hearings. Chief Donovan completed a report, which was submitted to Keith Hickey, the town manager, documenting his decision to terminate Officer A. This documentation was submitted to Hickey on ████████████.

This investigation **was** compliant with the Salem PD policy. This investigation **did meet** accepted best practices for internal reviews.

**Internal Investigation (formal) IA #01-12: ████████████**

A review of this incident shows a formal investigation ordered by Chief Donovan to be conducted by ████████████. This is in addition to a criminal investigation assigned to ████████████. While the IA investigation was assigned to the next highest rank in accordance with department general orders (65-7, IV, D), it is not considered best practice to have a member of a union investigating another member of the same union. In addition, the criminal investigation being assigned to ████████████ appears to violate General Order 65-7, IV, D in that an officer of the same rank is being assigned an investigative function. ████████████ is in the same union as ████████████ with the same concerns arising as previously mentioned. To make matters more complicated, the union president at the time was ████████████. It is unknown why the criminal investigation was not given to a higher-ranking member of the police department, as required in the contract, but it can be assumed that this is because the ████████████████████ and is representing the employee being investigated. This is another indication of how the current state of union operations is potentially



Drummond Woodsum

disruptive to essential police functions. Given the situation at hand, the investigative function of a matter so serious should have been retained by the chief himself. The incident being investigated resulted in ███████ being arrested by the Salem PD and transported to the hospital after a single vehicle crash where ███████ was allegedly driving while intoxicated. This crash was preceded by an incident at a shopping mall in a neighbouring jurisdiction where ███████ was behaving in a disoriented manner. Witness statements were gathered, evidence was collected, the accident was photographed, and full and complete police reports were generated. During this internal investigation, the ███████████████ union representation. ███████ was placed first on administrative leave but worked with human resources to request time off under the Family Medical Leave Act (FMLA) to seek medical treatment. While ███████ was on ████, ██ tendered a letter of resignation.

This investigation *was not* compliant with the Salem PD policy (assigning a person of the same rank to conduct the investigation). This investigation *did meet* acceptable best practices for internal reviews.

### Internal Investigation (formal ███████: Officer B and Officer C

A review of this investigation shows a formal inquiry into the conduct of Officer B and Officer C regarding off duty conduct on ███████████. The investigation was assigned to ███████ ███████ During this incident, Officer B, while off duty, was seen traveling 62 MPH in a 30 MPH zone by ███████, also of the Salem PD. ███████ activated his emergency lights to initiate a traffic stop, and Officer B did not pull over. ███████ deployed stop sticks in attempt to stop Officer B's vehicle but Officer B maneuvered his vehicle around them. ███████ caught up with Officer B's vehicle and when Officer B exited the vehicle, he was laughing, thinking the whole incident to be a joke. Officer C was a passenger in Officer B's vehicle during the events, and he was exonerated of any wrongdoing. Officer B was charged with being in violation of the Salem Police Code of Conduct, and the allegations were sustained with a one-day suspension without pay issued as discipline.

This investigation *was* compliant with the Salem PD policy. This investigation *did meet* acceptable best practices for internal reviews.

### Internal Investigation (Informal): Officer D

A review of this incident shows ███████ assigning ███████████ to investigate a complaint made by a citizen against an officer for unnecessary use of force. In this one-page total offering of the internal packet, it was found Officer D did make physical contact with the complainant but that it was a necessary and lawfully applied control tactic (seemingly placing his hand on her chest to stop her from moving forward). It is unknown if this occurrence was documented in the police report as the report is



Drummond Woodsum

not offered with this internal packet. Additionally, based on the current use of force reporting rule, this type of action would not need to be documented or reported by the officer. (However, Kroll was informed that the current practice does require it.) More concerning than this is the allegation briefly mentioned in the report that the complainant tried to file a complaint at the time of occurrence and spoke with the sergeant about the incident. General Order 65-3, V & VI states that "the supervisor will describe the issues of the complaint in writing providing all information is available at the time" and "all complaints will be accepted by this agency. Complaints may be given in person, over the phone or in writing....The complaint receive by the supervisor shall be forwarded to the Chief of Police." If these actions were followed, there is no documentation offering such. In the memorandum documenting this investigation, it states that ▇▇▇▇▇▇ told her that she "could go to the police department to file a complaint." This is in direct contradiction with General Order 65-3. This incomplete investigative report offers a suggestion that supervisors are not in fact taking complaints and documenting them but placing the burden on members of the public to bring a complaint forward, and to not only report it to a supervisor at the time of occurrence but also take additional efforts to respond in person to the police department for an additional potentially burdensome complaint reporting process. This suggests supervisors are able to ignore complaints that come in through a less formal process and not take the action required by policy. It could also inadvertently dissuade citizens from bringing complaints forward if their initial complaint is dismissed or ignored.

This investigation *was not* compliant with the Salem PD policy (supervisor's obligation to take and document a complaint). This investigation *did not meet* acceptable best practices for internal reviews.

### Internal Investigation (informal): Officer E

A review of this incident shows an informal investigation ordered by ▇▇▇▇▇▇▇. This investigation was ordered on ▇▇▇▇▇▇▇ after an incident occurred on ▇▇▇▇▇▇▇. It is unknown how this investigation came to the attention of the Salem PD. This packet includes a letter of findings issued by ▇▇▇▇▇▇ stating that ▇▇▇▇▇▇▇ conducted an investigation and found that Officer E had no probable cause to arrest the subject and no authority to seize or tow the vehicle. None of the efforts of ▇▇▇▇▇▇▇ during this investigation are present with this packet. The memorandum states Officer E was found in violation of general order 25-1, Article V, Section 5.14 – "performing assigned duties in a careless or negligent manner." The memorandum also mentions another informal investigation into a similar incident (details not provided) from ▇▇▇▇▇▇. The ▇▇▇ incident was handled with a letter of counselling, according to the memorandum. Approximately five months later, with the ▇▇▇ incident, we see what is purported to be another violation described as "very similar in nature." The ▇▇▇ incident is handled with a written warning. While progressive discipline is being



Drummond Woodsum

followed, this is a second incident which resulted in a custodial arrest being made without probable cause and property being seized without authority, two very serious matters. More concerning than the written warning is the lack of any remedial training or performance improvement efforts instituted by the agency to assist this officer in making better decisions. Arresting a person without authority, in demonstrated patterned behaviour, is concerning beyond an informal inquiry. Any employee counselling efforts that may have occurred were also not documented. It is difficult to believe an officer would be allowed to exhibit this type of concerning behavior without the agency taking a more serious approach to try and stop the action from occurring in the future.

This investigation **was** compliant with the Salem PD policy. However, there is a lack of documentation that makes ***it impossible to determine*** if the investigation met acceptable best practices for internal reviews.

### Internal Investigation (formal) IA # ███: Officer F

A review of this incident shows a formal investigation assigned to ████████████ conducted on ████████████. The entire documentation of this investigation consists of two memorandums. One documents the details of the investigation and the other is a memorandum documenting a reduced discipline negotiated by the union. This investigation was initiated after Officer F was involved in an off-duty traffic crash after consuming alcohol and left the scene of the incident prior to officers arrival. This investigation was conducted by on duty supervisors ████████████ and ███████. Two policy violations were sustained as part of this incident, and the officer was issued a ten working day suspension without pay and follow up with the EAP. The end, result after negotiations with the union, was a five working day suspension. It is unclear why a reduced discipline would be agreed to in this situation.

This investigation **was** compliant with the Salem PD policy. However, the investigation is lacking thoroughness, and as such, this investigation ***did not meet*** acceptable best practices for internal reviews.

### Internal Investigation (formal) IA #███ ████████

A review of this IA investigation shows allegations being investigated by ████████████ in response to a formal complaint filed by Citizen 1, who contacted the Salem PD on ████████████ to report an incident that occurred on ████████████ at a local high school hockey game. ████████ was working a detail in uniform at the game, ████████████ for the Salem team. The allegation received was that ████████ made threatening statements and demonstrated intimidating behavior towards others. The events occurring on the ███ followed an altercation between ████████ and the





Drummond Woodsum

complaining parents at another ▇▇▇▇▇. Citizen 2 also filed a formal complaint against ▇▇▇▇▇ for the same incident. This complaint was filed on ▇▇▇▇▇. Citizen 1 alleges unprofessional conduct, the use of vulgar language and intimidation. A third complainant, Citizen 3, wrote in an email complaint but never completed the "formal complaint" paperwork at the police department.

Five allegations were investigated against ▇▇▇▇▇: unprofessional behavior, intimidation, inappropriate language, aggressive or threatening behavior and conflict of interest. The allegation of unprofessional behavior was sustained for ▇▇▇▇▇ by his confronting the parents while working the ▇▇▇ detail. The intimidation/aggressive or threatening behavior allegation was exonerated with ▇▇▇▇▇ actions being classified as required police responsibilities at a ▇▇▇ game detail. While there were repeated witness statements and an admission from ▇▇▇▇▇ about his use of inappropriate language, this was classified as "unfounded" due to "inconsistencies." Lastly, for the conflict of interest, ▇▇▇▇▇ was exonerated. ▇▇▇▇▇ was issued a written warning and given clarification of expectations for the future regarding his ▇▇▇▇▇▇▇▇.

The findings of this investigation in the area of inappropriate language are surprising given the evidence offered in support of this allegation. Although it was not within Kroll's scope to investigate facts of a complaint, ▇▇▇▇▇ provided documentation to Kroll regarding this complaint and offered a statement of his version of events. He informed Kroll that the complaint was exarcabated based on tensions that he was having with members of the Board of Selectmen. He stated that his witnesses who verified his side of events were not allowed to give statements as they would all be seen as friends and family supporting him. The file listed contact with some witnesses who supported ▇▇▇▇▇ version of events, but it is unclear what, if any, information was considered from them. ▇▇▇▇▇ was told that he had to receive some sort of discipline due to politics, although the exact disciplinary measures are unclear. The findings seem to support that a compromise was reached in the investigation.

This investigation **was not** compliant the Salem PD policy (conducting complete investigations focused solely on the truth). This investigation **did not meet** acceptable best practices for internal reviews.

### Internal Investigation (informal): Officer G

A review of this incident shows an informal investigation assigned to ▇▇▇▇▇ assigned by ▇▇▇▇▇ Into the accidental discharge of a firearm by Officer G on ▇▇▇▇▇. This packet contains an investigative report coversheet as required. A use of force report is also included. Police reports were completed by all officers. The personal accident injury notification form, which was completed by ▇▇▇▇▇, the supervisor on duty at the time of the incident, does not have any



Drummond Woodsum

narrative in the section asking for a description of conditions that may have contributed to the accident/injury nor does it have the section taken about what has or will be done to prevent a recurrence. This is uncommon as the narrative reports explain both of these areas well. Review of policy and remedial training are both recommended although no documentation of either occurring are offered as part of this permanent record. Overall, this investigation is one of the most complete packets offered in an internal investigation.

This investigation **was** compliant with the Salem PD policy. This investigation **did meet** acceptable best practices for internal reviews.

### Internal Investigation (informal): Officer H

A review of this investigation shows a complaint being received by the New Hampshire Attorney General's Office regarding a complaint of Officer H choking a subject during the booking process on



▮▮▮▮▮▮. Upon receiving this complaint, ▮▮▮▮▮▮ assigns ▮▮▮▮▮▮ with conducting an informal inquiry into this incident. This allegation meets all the criteria established in General Order 65-3 for a formal complaint, yet it is investigated as an informal inquiry.

Four allegations are made in this complaint. The first is that the complainant was held up by the neck by the officer. Review of booking photos show redness on the subject's neck. ▮▮▮▮▮▮ speaks with the officer who denies the allegation. No effort to speak with a dispatcher who might have seen the incident via camera is made. Based on the officer refuting the allegations, it is determined this part of the investigation is unfounded. The second allegation that the officer "elbowed" the complainant in the eye is also unfounded citing no visible injury being observed. Once again, no investigative effort other than getting the officer's statement was made. The third count, consisting of two parts, alleges complainant was escorted into the cell via holding him by the neck, which was exonerated as an acceptable practice per ▮▮▮▮▮▮. The second part of this allegation was that complainant was "choke slammed" to the ground. This part of the allegation was unfounded based on lack of observed physical injury. The forth allegation is that Officer H made threatening statements to complainant. Here it is stated: "None of the officers involved heard you make these statements." Therefore, this final allegation is not sustained. There is no mention of interviewing the other officers who did not hear the statements about the other allegations. Also, no effort was made to identify a dispatcher or other department member who might have observed the physical contact between Officer H and complainant.

While the findings are a result of an incomplete investigation, most concerning is that this incident is not investigated as a formal complaint despite the subject going to the Attorney General's Office. It is



unknown if the Attorney General's Office conducted its own investigation into these matters or if the lacking efforts on behalf of the Salem PD are the entirety of this investigation.

There were no photographs in the package. The was no notice to Officer H of the complaint's receipt on ███████████. There is a notice to him listing that the charges were unfounded and not sustained on ███████████, which, in and of itself, would have been a violation of the CBA's 10-day notice requirement.

This investigation **was not** compliant with the Salem PD policy. It ***did not meet*** acceptable best practices for internal reviews.

**Internal Investigation (informal): Officer F**

A review of this incident shows an informal investigation assigned to ███████████ as a result of Officer F's off duty arrest for driving while under the influence on ███████████. A memorandum documenting the events occurred and alleged violations is included as an investigative report along with the incident report from the New Hampshire State Police. The report documents Officer F resigning from the Salem PD on ███████████ and offers this as the reason for the lack of a formal IA investigation.

This investigation ***was not conducted*** due to the officer's resignation.

**Internal Investigation (informal): ███████**

A review of this incident shows an informal investigation assigned to ███████████ by ███████████ ███████, which references recurring harassment of one of the staff members, who, reported on ███████ ███████. The first two incidents (███████████ and ███████████, respectively) are not investigated because of the time restriction imposed in the CBA. This is a problem in that it distracts from the entire scope of the situation being considered and addressed. While the first incident seems to have been reported and addressed informally at the time (without an investigation), in the second incident, the ███████████ allegedly makes a comment related to the employees off duty sexual conduct. This is inappropriate for a work environment, especially from a ███████████ It is dismissed in this allegation as being offered in a "sarcastic joking manner" and "past the six-month union time frame." It is inexcusable for a workplace to investigate such an egregious allegation from an ███████████████ conduct, especially when an internal witness was involved in the situation. The third allegation happened within the allowed timeframe but was not sustained. This was followed by two incidents of rude or offensive comments that were sustained. A letter of counselling is issued but there is no remedial training effort required or any apology offered to the ███████████. There is a mention



Drummond Woodsum

of a meeting with human resources, which is documented. The human resources representative recommended a follow up both with the employee to ensure the environment has improved and also with the ██████ to monitor behavior. None of this follow up is documented as part of this packet. This is concerning as the contents of the investigation show a ██████ who admits to intentionally not speaking with one of ██ ██████. Lack of ██████████ can be just as dangerous in police operations as lack of communication on the street. It is imperative that all employees work in a cooperative and professional manner. While the incidents reported occurred during times where there was not a critical incident occurring, this level of uncooperative effort during a serious police event could result in a failure of duty or someone getting hurt. This packet also contains log entries referring to this ██████████ potentially hearing other employees as well; this information comes from a log entry on ██████████ stating that the agency "will have a lawsuit coming due to ██████ treatment of the complainant." Neither is the ██████ documented as making these comments nor is the victim interviewed as part of this packet. Potentially more concerning is the fact this statement was documented in the log, and no investigation was initiated into this comment. Based on the pattern of behavior and seriousness of allegations, a letter of counselling without any remedial training being offered or a formal performance improvement plan being implemented is concerning. We see in this investigation just how potentially detrimental the six-month limit to investigating a delayed report of misconduct can be to responsible operations.

This investigation **was not** compliant with the Salem PD policy (informal v. formal inquiry). This investigation **did not meet** acceptable best practices for internal reviews.

### Internal Investigation (formal) IA #██████: Officer I, ██ A, Officer J and Officer K

A review of this incident shows a formal investigation into the conduct of Officer I conducted by ██████ ██████ at the direction of ██████████. This investigation was initiated as a result of the Salem PD being made aware of an investigation by the New Hampshire Attorney General's Office into excessive force by Officer I during an incident occurring on ██████████. The arrestee in the ██████ incident filed a complaint with the Attorney General's Office that he was assaulted by Officer I while he was handcuffed. Complete documentation of the incident and investigation is offered as part of this packet, including the extensive documentation by the Attorney General's investigation. Interviews of witnesses are conducted, and a thorough effort is put forward to investigate all allegations. A recommendation for termination is the result of the investigation and a hearing date was scheduled for ██████████. Two arrest warrants were issued for Officer I on ██████████. Officer I turned himself in on the warrants. The hearing was held and a recommendation for termination was made to Town Manager ██████████ by ██████████ on ██████████.



Formal IA investigations were also conducted into the conduct of ██████ Officer J and Officer K for the same incident. ████████ was exonerated of allegations of excessive force but allegations for lack of supervision were sustained with a five-day suspension without pay and the failure ████████ was sustained with a letter of counselling recommended. Both Officer J and Officer K were exonerated for excessive use of force. All documentation for these investigations is provided in a thorough and complete manner but are not as comprehensive as the investigation of Officer I's conduct.

This investigation *was* compliant with the Salem PD policy. This investigation *did meet* acceptable best practices for internal reviews.

### Internal Investigation (informal): Officer L

A review of this incident shows an informal investigation initiated and led by ████████. ████████████ issued a memorandum to Officer L after he missed court on ████████. The documentation in this investigation is incomplete. It discusses an email on ████████ from Attorney ██████ that is included in the packet but only reads "XXXXXXXXXXX. $5k c/s." If this is supposed to be a notice to appear in court, it is insufficient as there is no date in the body of the email or any time or location of appearance. While these two things may be common knowledge in this institution, from the standpoint of a reasonable person, the information appears lacking. The memorandum further states that the hearing was not posted on the court board. It then states the officer received two notifications via email advising him of the hearing, but neither the first nor the second notification contained a time or location of appearance. No policy regarding officers' necessity to check email or the frequency of that task was included with the policy packet. Nor was there a policy on court notification procedures. Additionally, it is unknown if the emails were read or received by this officer. It is unknown if any of these factors were even explored as part of this investigation. It appears this court date should have appeared on the court board based on the comment acknowledging that it was not there. It is unknown why this hearing did not make it to that board since no investigation into that appears to have been done. Despite this lack of content, the allegation was sustained and a letter of counselling was given to the officer for this violation.

This investigation *was* compliant with the Salem PD policy (however, it seems to be lacking documentation). This investigation *did not meet* acceptable best practices for internal reviews.

### Internal Investigation (informal): Officer M

A review of this incident shows an informal inquiry by ████████ into the conduct of Officer M on a traffic control detail that occurred on ████████. During this detail, the driver of a vehicle failed to obey Officer M's traffic control signals. In an attempt to get the driver's attention, Officer M hit



the trunk portion of the vehicle causing damage and upsetting the occupant family and then spoke to the family in a rude and vulgar manner. The packet offers a full investigation with interviews being conducted with officers and witnesses and photos being taken of the damage to the vehicle. A sustained finding of a policy violation was the result, with a letter of counselling offered as the recommended discipline. The complaint was handled as an informal inquiry even though the complainant signed and completed a formal complaint form.

This investigation *was not* compliant with the Salem PD policy. This investigation *did meet* acceptable best practices for internal reviews.

### Internal Investigation (informal): Officer M

A review of this incident shows an informal inquiry into a citizen complaint of excessive use of force investigated by ███████████████. This packet is incomplete with only the memorandum included without the original incident report, complaint form or any other documentation. The second paragraph of this memorandum states, "Complainant called the shift commander and wanted to file a complaint of excessive force on Officer M. ███ was advised how to make that complaint, ███ refused to come to the Salem Police Department claiming ███████ in fear of being assaulted." The memorandum goes on to explain that the citizen called again with the same complaint the next day and "was once again informed on the Salem Police Department policy and practice on filing complaints."

We see documented practices inconsistent with the agency's General Order 65-3, V & VI, which states, "the supervisor will describe the issues of the complaint in writing providing all information is available at the time" and "(a)ll complaints will be accepted by this agency. Complaints may be given in person, over the phone or in writing….The complaint received by the supervisor shall be forwarded to the Chief of Police." The citizen offering the complaint is given instruction to come to the police department to file the complaint. In this set of circumstances, the citizen expressed that ███ was fearful of responding to the police agency, and rather than the police agency documenting the complaint as required by their policy. The complainant is repeatedly told to come to the police department to file a formal complaint. This practice actively dissuades members of the public from having their complaints against the police department heard and can be construed as intimidating.

The memorandum documenting the investigation was offered without a copy of the report, the Facebook video, the security footage from ████ or the Fire Department run sheet. The booking camera does not record events, but active recording of the booking room and any holding areas would be in line with national best practices along with a video retention policy that follows some set of



standards. Those interviewed stated they welcome video recording in the cell blocks and booking area. This is an immediate low-cost step that would protect both officers against false complaints, as well as document any concerns expressed by suspects. While it does appear that the investigation was done in a responsible manner and no excessive force occurred, the lack of documentation kept as part of the informal inquiry coupled with the violations of general order by department members, expose substantial areas of concern. Chief Donovan noted the following regarding this IA investigation:

> CHIEF DONOVAN: I'd need to look at it and see. No, this is an informal, it says right on it. Yeah, she was one ▉▉▉▉ didn't want to come because ▉▉▉ -- I mean, if you look at some of the hints right there▉▉ refused to come to Salem Police Department claiming ▉▉ was in fear of being assaulted, I mean, that's kind of like -- tells you a little bit why the complaint is the way it is. Yeah, I remember her▉▉▉ did file a -- ▉▉ did put a -- a little You Tube thing that she made on herself.
>
> MR. LINSKEY: Okay. So you became aware of a You Tube video that says that ▉▉ was assaulted while at the police department?
>
> CHIEF DONOVAN: There was actually a very long tirade that I think it kind of wounded off into something else and that's what it was on the -- on the YouTube page.
>
> MR. LINSKEY: So -- so ▉▉ called to make a complaint and it says ▉▉ was advised how to make a complaint, ▉▉ refused to come to Salem Police Department, so how do you make a complaint?
>
> CHIEF DONOVAN: No, if you come right in and fill out the complaint form, a citizen's complaint form.
>
> MR. LINSKEY: What if I don't want to fill -- come in and fill out a complaint form, can I still make the complaint?
>
> CHIEF DONOVAN: Oh, you still can make the complaint, we'll look at it, but we're not going to give it the same weight we're going to give it if somebody comes in and signs the form because when you sign a form you're swearing to the facts that everything that you say is true.

It is understandable that a citizen who submits a formal complaint under pains and penalties of perjury may be regarded with more credibility in instances where facts are unable to be proven or disproven and, therefore, the incident is unable to be sustained. However, the facts are the facts. In this case, the complainant alerts two supervisors as to her desire to submit a complaint alleging physical assault while in custody but expresses fear in doing so. ▉▉▉▉▉ is incorrect in asserting that the complainant's only course of action for submitting a complaint is in writing as this complaint, although not received in



Drummond Woodsum

writing, alleges criminal allegations of physical abuse by officers while in custody. The formal complaint process includes complaints submitted in writing and/or those that allege criminal misconduct or similar offenses, as defined below:

This investigation **was not** compliant with the Salem PD policy. This investigation **did not meet** acceptable best practices for internal reviews.

### Internal Investigation (formal) IA ██: Officer M

A review of this incident shows a formal inquiry conducted by ██████ into an incident that occurred on ████████ involving Officer M and a missing patrol rifle. The rifle was determined to be missing at the end of Officer M's patrol shift. An investigation was conducted, and it was determined Officer M unintentionally left the rifle on the trunk of his patrol vehicle at the beginning of his shift. The rifle was located by a good Samaritan who found the damaged rifle on the roadside. Two policy violations were found to be sustained as a result of this investigation. A five-day unpaid suspension was issued to Officer M as discipline to include a review of the applicable general orders.

This investigation **was** compliant with the Salem PD policy. This investigation **did meet** acceptable best practices for internal reviews.

### Internal Investigation (informal): Officer N

A review of this incident shows an informal inquiry conducted by ██████ on ████████ into a policy violation that occurred during a custodial arrest of a subject. This complaint came verbally through the prosecuting attorney after learning information from the public defender. It was learned during this arrest, Officer N took a photograph of the arrestee with his cellular telephone and sent it to a family member of the arrestee. The prisoner was allegedly urinating in the photo. While this is egregious conduct that disrespects and potentially humiliates the person being arrested and violates their privacy, this review was conducted as an informal inquiry. A policy violation was sustained with a letter of counselling being issued for engaging in conduct that could discredit the department. The arrest report and the photograph were not included in this packet. No mention of training on the treatment of prisoners, privacy protections or ethical conduct was mentioned as part of this informal inquiry.

This investigation **was** compliant with the Salem PD policy. This investigation **did not meet** acceptable best practices for internal reviews.



**Internal Investigation (Informal): Officer O**

A review of this incident shows an informal inquiry initiated by ▮▮▮▮▮▮▮▮ as to an incident that occurred on ▮▮▮▮▮▮. The entirety of this informal investigation was one memorandum. In reviewing the case files, it appears a citizen approached Officer O after the officer failed to use his directional and pointed out his violation of the law. Once the man left, Officer O reportedly activated his lights and followed the man, initiating a traffic stop and demanding identification. The citizen did not feel he violated any traffic law, so he attempted to go into his place of work at which time the door was forcibly shut by Officer O causing injury to the citizen's arm. There is a mention of the incident being recorded on a dash camera. It is unknown to whom the dash camera belongs. This information was related to ▮▮▮▮▮▮ by Officer O after the incident occurred, but we see no documentation from ▮▮▮▮ ▮▮ as to the allegations of making a stop without probable cause or assault. It can be assumed by ▮▮▮▮▮▮ involvement that the citizen reported the incident to him verbally. ▮▮▮▮▮▮▮▮ memorandum documenting the incident is written on ▮▮▮▮▮.

▮▮▮▮▮▮ meets with the citizen in the interview room and allows him to tell him the details of the events occurred. ▮▮▮▮▮▮ then states "I found his [The Citizen's] approach to be condescending and told him the same." ▮▮▮▮▮▮ goes on to state how the citizen was discussing the law and mentioned his father was a chief of police. ▮▮▮▮▮▮ goes on to tell him he is not impressed with his associations and seems to imply he ▮▮▮▮▮▮ knows more about the law than the citizen. ▮▮▮▮▮▮ also tells the citizen he is not going to dictate how the police agency would handle the investigation. ▮▮▮▮▮▮ then goes on to tell him that it is not an assault when a police officer causes physically injury to another without a "culpable state of mind." This seems to be in conflict with section 1.b of the state statute that reads:

NH Rev Stat § 631:2-a – Simple Assault:

I.    A person is guilty of simple assault if he:
(a) Purposely or knowingly causes bodily injury or unprivileged physical contact to another; or
(b) Recklessly causes bodily injury to another; or
(c) Negligently causes bodily injury to another by means of a deadly weapon.
II. Simple assault is a misdemeanor unless committed in a fight entered into by mutual consent, in which case it is a violation.

▮▮▮▮▮▮ then writes the following statement, "I informed him that he was free to file a formal complaint and that the matter would be fully investigated, to include any inconsistencies in the story." This



Drummond Woodsum

statement holds an implied threat that the citizen could potentially be investigated if he takes the steps established to file a formal complaint. Again, we must look at General Order 65-3, which states complaints will be accepted in person, via telephone or in writing. In this instance, the citizen has now spoken to two police supervisors about a traffic stop being made without probable cause and a possible assault and still has not officially "filed a complaint." We see a system designed to intimidate members of the public and make them fearful of the consequence of filing a complaint about concerning police conduct. ██████████ ██████ finishes the meeting by encouraging the citizen to discuss the events with his police associates and asking him what he did wrong in this situation, as if the citizen's decision to approach the officer and point out the traffic violations created this course of events.

██████████ does speak with Officer O after the meeting. Officer O stated that he reported the incident to ██████████ on the day of occurrence. There is no documentation of this complaint offered by either ██████████ or ██████████. Officer O states that the citizen was following him closely, gesturing for him to pull over. After Officer O pulled aside, the citizen approached him and told him he did not use his directional. According to Officer O, this was communicated with the use of expletives. Officer O then describes the citizen as pulling away at a "high rate of speed." Officer O admits he pulls the citizen over after this, allegedly for following too closely and speeding. The citizen travels to his place of employment and attempts to enter the building. He made the statement he did nothing wrong and wanted to go to work. It is unclear how Officer O determined he was speeding. Officer O "gives chase" and stops him from entering the building. Officer O requests identification, and the citizen refuses. When he is threatened with arrest for not providing identification, he complies with the officer's instructions. This reviewer is still not convinced there was probable cause for the stop. Some police cultures allow for police to initiate enforcement activity because the citizen's conduct was upsetting to the officer and challenged the officer's ego. The officer then finds reason for the police contact. Police must not allow personal biases to influence their decision to take enforcement efforts. General Order 25-1: Code of Conduct, Section VI (Discretion) calls for officers to not "base their actions or inactions…(on) personal bias or prejudice." Article X (Unethical Conduct) of this same general order discusses "Arbitrary or abusive use of police powers or arbitrary or abusive action taken under the color of police power in personal disputes or affairs" in subsection 10.07. While we can see suggestions that Officer O violated this general order, this is not investigated as part of the inquiry. Abuse of police authority is one of the most important behaviors that an agency can identify to ensure officers are conducting themselves in an appropriate and ethical manner.

The citizen states at the end of the meeting with ██████████ that he would like an apology from Officer O. This interaction is arranged by ██████████, and the citizen comes back to the agency the next day to receive his apology. At that time, he says he's had an unexplained change of heart and does not want to file a complaint. He further states that he, in fact, owes the officer an apology. He also apologizes to



Drummond Woodsum

███████████ and ███████████. When Officer O arrives, the complainant shakes Officer O's hand and thanks him for his service to the community. This inquiry is then closed, and no further action is taken.

In Chief Donovan's interview with Kroll, he stated the following:

> MR. LINSKEY: This particular case it looks like the guy, in my opinion, was being a wise guy, the -- the guy behind him[6]
>
> CHIEF DONOVAN: Oh, no question, yeah.
>
> MR. LINSKEY: -- turns -- turns the directional on, tells the officer, you know, hey --
>
> CHIEF DONOVAN: Maybe Officer O got tweaked, (name changed)
>
> MR. LINSKEY: Yeah.
>
> CHIEF DONOVAN: -- you know, he -- he didn't care for it.
>
> MR. LINSKEY: Would you agree that Officer O  got tweaked?
>
> CHIEF DONOVAN: Oh yeah, I would say he got a little tweaked on that one.
>
> MR. LINSKEY: Do you think that Officer O behavior of going after -- now all of a sudden this car is driving at a high rate of speed, he leaves a detail that he's providing protection from a -- a -- sounds like they're moving some heavy equipment or something and he's behind them with lights keeping them safe, he leaves that to go to a motor vehicle stop because someone pissed him off, basically, that's what it seems like to me.
>
> CHIEF DONOVAN: Oh, so they probably were already off the road at that point, that's probably why we didn't -- that's probably why we didn't bother doing anything more with him on that.
>
> MR. LINSKEY: But you agree, he -- he -- he got pissed and he was spotted --
>
> CHIEF DONOVAN: Oh he was -- yeah, he probably did, he –
>
> MR. LINSKEY: The guy didn't have a two inch gash before the interactive with the officer, he did after.
>
> CHIEF DONOVAN: Well that's an assumption, I mean --
>
> MR. LINSKEY: I don't know that, I can't, I mean, the Investigation[7] -- he says he was injured and there's – he knows cops -- formal complaints, I told him I was quite certain the officer didn't have any reason to stop him, therefore, reason -- I also indicated

---

[6]Officer O was in a cruiser working a detail following heavy equipment when the complainant pulled up next to him and complained about the officer not using a directional. The complainant drove off.  Officer O decided to follow the subject and conduct a stop, and during the course of their interaction, the complainant was cut trying to enter into his work facility.

[7] *Linskey reading from report of informal investigation of ███████



officer Officer O by statute had not assaulted him. I pointed out that he acknowledged he did not realize his arm was cut until after the two had separated and that in order to prove an assault there would have to be a culpable state of mind and one that clearly did not exist in this case law. That sounds like a lot of -- whether it was an official assault or not, but it seems like, you know, the guy has the altercation with the officer and he's cut afterwards and -- and comes and makes a report of it.

CHIEF DONOVAN: Oh, okay.

MR. LINSKEY: Any concerns about that that that should have been documented, a picture of the cut, to say, you know, it's consistent with somebody or not consistent that -- that a little more could have been done with this? I know it looks like they worked it out.

CHIEF DONOVAN: Possibly, yeah possibly, but why -- again, the -- the purpose of the informal is if you can work it out you just work it out and if the person's okay when -- when they leave and they're -- they're satisfied, I mean, I think that should be one of their goals is, you know, the person should leave and hopefully that they're satisfied, hopefully that they and the officer both have a chance to get their act and maybe the officer now realized, yeah, I guess I did give you -- they weren't after this guy after all either.

MR. LINSKEY: Do you think it would have been helpful for the lieutenant to maybe have a counselling session with the officer to say, look, this worked out?

CHIEF DONOVAN: That probably did happen, it probably was just not documented, but he probably did talk to him and say --

It is Kroll's belief that this investigation is another example of an informal investigation that should have been elevated to a formal complaint. Further, the lack of documentation relative to the citizen's alleged injury puts the officer, department and town at risk should litigation occur in the future.

Kroll also spoke with Deputy Chief Morin regarding this incident. His comments are included as follows:

MR. LINSKEY: This one is a -- I think you were involved in this one. ██████████ assigned it to you ████████. This is Officer O and a citizen.

DEPUTY CHIEF MORIN: I don't recall it but what's about?

MR. LINSKEY:  a citizen was -- took umbrage with Officer O operation of his motor vehicle of his police car and he pulled alongside him and told him as such.

DEPUTY CHIEF MORIN: Okay.

MR. LINSKEY: Okay, so it seems similar to the one you talked about that was in there; right? So, woman got pulled over, she had some concerns, she made a complaint, she came in had a conversation, there was a meeting, there was an explanation as to, you know, hey this is what played out, this is why it played out, it came to a conclusion she said, ah you know what, having all that knowledge I didn't know that, I'm okay now, I'm fine, similar type thing; right? Any concern with Officer O -- Officer O's behavior here?

DEPUTY CHIEF MORIN: No, and I -- I know that you don't know these officers, when you -- and obviously when you know an officer and you know his character and you know his demeanor and Officer O  is one of our ██████████, as a former ██████████, ██████████████████████████████████, sometimes we have to check Officer O to see if he still has a pulse because he's that even keeled and when we made him a ██████████, myself and ██████████ were -- ██████████████████████, and one of our concerns was just that, ██████████████████████, you know, follows down the lead. Officer O ██████████████████████████ amazing, but Officer O is not a high strung -- that's not who he is, you know, he also doesn't make a ton of car stops so if he made a car stop there's a reason why he made the car stop.

MR. LINSKEY: Well that's just it, what do you think the reason was he made the car stop?

DEPUTY CHIEF MORIN: Whatever it was that alerted it to him he felt it was egregious enough for him to make the car stop.

MR. LINSKEY: You don't think that he felt like the guy was breaking his balls and came up beside his window and told him, you know, you didn't use your directional and took off and he's like you're going to tell me what to do?

DEPUTY CHIEF MORIN: No.

MR. LINSKEY: That wasn't -- that thought never entered your -- as a possibility?

DEPUTY CHIEF MORIN: Some other people I would say yes.

MR. LINSKEY: But not him?

DEPUTY CHIEF MORIN: Officer O , no.

MR. LINSKEY: Because he's performing security for the detail; right? They got this big piece of equipment and he's following behind him with the lights on, this guy rolls over, gives him -- gives him a hard time really, gives him a -- yeah, you pointed out to the guy, like, wouldn't it had been better if you called the station than to confront the officer directly, and then all of a sudden a guy who doesn't make a lot of car stops makes a car stop. Did you at least have that conversation with him or did you consider that?

DEPUTY CHIEF MORIN: I -- I did have that conversation with him --



MR. LINSKEY: Okay.

DEPUTY CHIEF MORIN: -- but I've worked with Officer O for ▮▮▮▮▮▮▮, so I know him and I'm sure that you can look back in your time with Boston PD, people that you know.

MR. LINSKEY: Sure.

DEPUTY CHIEF MORIN: He's not a high-strung guy, he's not one of those that I'm going to show you, you know, like I said, we have to check his pulse sometimes to make -- now, having said that, he's the guy that's always in the right place at the right time, that doesn't happen by accident, --

MR. LINSKEY: Right.

DEPUTY CHIEF MORIN: -- as you know. The fact that he ▮▮▮▮▮▮▮▮▮▮ that's amazing doesn't happen by accident, but he is just very quiet, wouldn't say shit if he had a mouthful, and that's who he is, so, you know, the first instinct that I had is, okay, there's more to this story, I hear the guy out, he's condescending in his tone, his daddy --

MR. LINSKEY: Sure.

DEPUTY CHIEF MORIN: -- is a police chief and I point out to him that, you know, perhaps he could have handled it better, invite him to file a complaint, two days later he comes back and says I thought about what you said; okay? So he was hot, he was pissed that Officer O pulled him over. Officer O probably chewed him -- chewed him a little bit; okay? But again, that's not who this guy is, so --

MR. LINSKEY: But we all have a bad day, I mean, I've --I've -- I've --

DEPUTY CHIEF MORIN: Of course we do.

MR. LINSKEY: -- you know, I've --

DEPUTY CHIEF MORIN: Of course we do.

MR. LINSKEY: -- had my button pushed, every cop in America --

DEPUTY CHIEF MORIN: Of course we do --

MR. LINSKEY: -- has had their button pushed.

DEPUTY CHIEF MORIN: -- and had this guy wanted to file a complaint, it would have been fully investigated, but he wanted to -- he wanted to air his grievance, he got to say what he had to say; ▮▮▮▮▮ listened to what he had to say and ▮▮▮▮▮ okay, well how do you think that you could have handled that better to have avoided this?

MR. LINSKEY: Sure.

DEPUTY CHIEF MORIN: They shake hands, there's no complaint, everybody goes home happy.



MR. LINSKEY: Okay. What about the injury, were there any photographs taken of it?

DEPUTY CHIEF MORIN: I -- I didn't read it that closely, I'm sorry, injury.

MR. LINSKEY: He claims he got injured when the officer closed the door on him as he's trying to get into the work place.

DEPUTY CHIEF MORIN ████████████████ photograph of the injury.

MR. LINSKEY: Okay. But you said you did have a little conversation with him about, hey, did you --

DEPUTY CHIEF MORIN: I had -- I had a lot of conversation with him, I mean –

MR. LINSKEY: Not -- not with the complainant, with --

DEPUTY CHIEF MORIN: With Officer O ?

MR. LINSKEY: -- Officer O.

DEPUTY CHIEF MORIN: Yeah, I did.

MR. LINSKEY: About did he -- did he piss you off and --

DEPUTY CHIEF MORIN: Yeah, I did.

MR. LINSKEY: Okay.

DEPUTY CHIEF MORIN: Okay? But again, that's not who this guy is.

MR. LINSKEY: Okay. But ████ didn't note that in the report, that had a conversation with him, that, you know, it might of -- it might have been his attitude that because him to -- and, you know, just to be careful of that when making those type of responses, because I've seen in other reports you've made that -- you've kind of articulated, hey, you know, this -- this --

DEPUTY CHIEF MORIN: And again, if Officer O was that guy, then it would have been noted, so some of the other people that may have been noted –

Two concerns come to light in Deputy Chief Morin's comments: 1) The disregard of a complaint based on his own personal assessment of or feelings toward an officer, and 2) The lack of formal documentation relative to an injury that allegedly occurred during a physical encounter with a police officer. It is improper policy, and quite risky, to dismiss or disregard a complaint based on one's own personal feelings towards an officer. Each investigation should be considered on its merit, and while the human element obviously is a factor, it cannot be the only factor in determining the validity of a complaint. Deputy Chief Morin should have interviewed and documented Officer O's testimony, and Deputy Chief Morin should have supplemented Officer O's interview with a similar interview with the citizen. Photos of the injury should have been taken.



Drummond Woodsum

While the department resolved this matter seemingly to everyone's satisfaction, the case file contained no such documentation as to interviews with relevant parties, photographs of alleged injuries or proof of counseling provided to Officer O, whereas Kroll did identify counseling records in other IA investigative case files. This inconsistency is not keeping with best practice as it could lead to an appearance of one set of rules for some employees and another set of rules for others.

This investigation **was not** compliant with the Salem PD policy. This investigation **did not meet** acceptable best practices for internal reviews.

### Internal Investigation (formal) IA #███: Officer P

A review of this incident shows a formal investigation for a policy violation occurring during a custodial arrest on ███████████. This arrest was made by Officer P, who arrested a subject while the subject was awaiting the arrival of a bail commissioner. Officer P placed the subject back into a holding cell. Policy requires all personal property to be taken from prisoners prior to the prisoner being placed into a cell. Officer Officer P failed to take the subjects cellular telephone from the subject. Upon the subject's release, it was learned the subject had made a video of himself sitting in the holding cell and posted it to Facebook. Officer P learned about this and self-reported it to his supervisor. The investigation was conducted, and the policy violation was sustained. The discipline recommended was a written warning.

This investigation **was** compliant with the Salem PD policy. This Investigation **did meet** acceptable best practices for internal reviews.

### Internal Investigation (informal): Officer Q



A review of this incident shows a citizen making a complaint of excessive force to ███████████ on ███████████. At the time of the complaint, ███████████ informs the complainant of the "complaint process" to which he cooperates and completes a written statement. ███████████ photographs the injuries the complainant alleges occurred during an arrest situation involving Officer Q earlier that day. The incident report, written statement and intake form are not included as part of this packet. Instead this inquiry consists of one single memorandum prepared by ███████████. The narrative documents the citizen's arrest, which included an incident where Officer Q observed a vehicle travelling at a high rate of speed. While no radar was operable to record the speed, Officer Q estimated the vehicle to be traveling between 80-90 MPH, according to this memorandum. It is unknown how this estimation was calculated. The memorandum then states the driver and passenger were both arrested without incident. The details of that arrest, which appear to have some importance as to the allegations being brought forward are unable to be reviewed due to a lack of supporting documents. The driver was arrested for reckless operation and the

*Private and Confidential*



passenger, the complainant, was arrested for possession of marijuana. During the processing of the complainant, there was an altercation between Officer Q and the citizen.

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ all responded to the booking area at some point and observed the complainant being combative. ▮▮▮▮▮▮▮▮ observed the struggle via camera. Force was used to keep the citizen from assaulting the officers and to control his behavior. There is mention of all officers involved completing the use of force report. It is unknown if the minor injuries to the citizen qualified as an "injury" from the officer's perspective at the time of the incident or if this was done upon request after this complaint came in. These documents were not included in the informal inquiry packet provided. With four witnesses to the citizen's combative behavior, the allegations of excessive force were classified as necessary force used to control the subject during the arrest. There were also allegations of missing money and property. These allegations were dismissed with no investigation documented. The statement, "... it is highly unlikely the citizen had this money on him at the time of arrest," seems insufficient when considering the seriousness of the allegation. Additionally, Officer Q stated that the citizen had a lighter, belt and string on his person at the time of his arrest, but only the item listed in ▮▮▮▮▮ personal inventory is a belt. This discrepancy should have been investigated further as it suggests there may have been other property that was not accounted for. It can only be assumed that because the excessive force part of the complaint was found unsubstantiated, that any other parts were assumed to not have merit as well. This is a dangerous practice and not in compliance with General Order 65-3 stating all complaints will be fully investigated.

More concerning than the lack of investigative effort into all parts of the allegations is the fact that this incident was not conducted as a formal complaint. General Order 65-3 offers clear guidelines on what type of allegations and circumstances must be present for a both formal and informal complaints. This general order defines a formal complaint as "a complaint received under the above guidelines that is submitted in writing, where the complainant is available for follow-up investigation, interview, and/or the complaint alleges criminal misconduct of a similar serious offense." The complainant's allegation met all the criteria established by General Order 65-3 for a formal complaint, yet this process was conducted as an informal inquiry. There is nothing in the general order that offers discretion of the agency to move formal complaints to informal complaints. Due to the informal nature of this inquiry, many steps were not taken that would have been required as part of the formal process. An example of this are the attempts to speak with the only witness not employed by the Salem PD, the citizen's co-defendant. There is no mention of any effort other than repeated attempted phone calls to contact the subject. Considering the subject might have information that would be valuable to this inquiry, a stronger effort to may contact should have been made.



Drummond Woodsum

This investigation **was not** compliant with the Salem PD policy. This investigation **did not meet** acceptable best practices for internal reviews.

### Internal Investigation (informal inquiry): Officer R, ███ and Officer B

A review of this incident shows an informal inquiry into a complaint of excessive force by officers during a custodial arrest situation on ███████. The investigation was conducted by ███████ after a complaint was submitted via email by the boyfriend of the arrestee (alleged victim). The boyfriend of the arrestee was also arrested during this same incident, but his complaint was about how the officers treated his girlfriend. The allegation is that officers grabbed her hair, tore her pants, bruised her arms and slammed her to the floor. Arrest reports are attached to this inquiry for review. ███████ spoke with some of the members of the Salem PD involved in this incident. Officer B admits to grabbing the arrestee's hood and hair to stand her erect. While it is understood that the officers were attempting to stand her up, it is a dangerous practice to bring a person to a standing position by grabbing his/her hair or a piece of clothing worn around the neck. Police are routinely trained in tactics that identify grabbing subjects by the neck as deadly force, and they are trained in alternate compliance and assistance holds to avoid this sensitive area. The conversation with Officer B and a review of the reports seem to be the extent of this investigation. Even though Officer B grabs the subject by the hair and hood to assist her to standing, this is not addressed as an area of concern or a training issue. No counseling or alternative methods that would be less dangerous to the arrestee were documented. Also, the complaint mentions another officer having contact with her after the incident and laughing about her injuries. This part of the complaint is completely overlooked as part of the inquiry. ███████ claims he cannot reach her because of a phone number that is out of service, but it appears the officers have had contact with her after the incident, and there is even a suggestion that they would be able to identify her place of employment. None of these avenues were explored to contact her, and one phone message was the extent of the attempted contact with her boyfriend.

Further, we see a complaint that comes in meeting the definition of what should be a formal inquiry based on General Order 65-3, and we see it being handled as an informal inquiry by the Salem PD. Additionally, after the alleged victim's boyfriend submits a complaint, of a serious nature, in writing, and identifies himself as the complainant, all the criteria required for a formal complaint, ███████ states, "if the alleged victim's boyfriend returns my call, I will inform him that if she wishes to file a complaint, she will need to report to the PD to do so." It is a concerning practice to insist individuals respond to the police agency as the only way to have a formal complaint filed. This is especially concerning considering General Order 65-3 clearly allows for other reporting methods to be accepted. An identified pattern of not following established policy for the acceptance of formal complaints is obvious. Requiring redundancy of reporting on behalf of citizens wishing to bring allegations of police misconduct to the attention of the agency is a poor practice.



Drummond Woodsum

Often if the first outcry is not taken seriously, citizens will not trust the police to take action with the additional reporting effort. This seems to be used as a tactic to intimidate people from bring complaints forward against the officers and an excuse to classify serious allegations as "informal inquiries" despite a policy that mandates a formal investigation.

Chief Donovan noted the following regarding this investigation:

> MR. LINSKEY: *(Linskey reading from* ▆▆▆ *report)* *I left a message for boyfriend of the arrestee* [8] *to call me if he wished to shed more light on his claims, as I'm writing I have not heard back from him. I also attempted to contact his girlfriend but the phone number listed on the arrest report is no longer in service. If he returns my call I will inform him that if she wishes to file a complaint she will need to report to the PD to do so.*
>
> MR. LINSKEY: *So, even though boyfriend of the arrestee had sent an email and written a complaint about excessive force that he says occurred, although it occurred to his girlfriend, that's not considered a complaint?*
>
> CHIEF DONOVAN: *Well I think that's why they looked into it as much as they did but if she wanted to file a complaint she's -- she's more -- she was more than welcome to. I think you can see she was kind of a soup sandwich.*
>
> MR. LINSKEY: *Yup.*
>
> CHIEF DONOVAN: *And that's what happens, you know, you'll get that and then you'll never hear from these people again and chances are she probably hasn't even come through Salem again. This is like a main drag through for people to come to get drugs from Lawrence and we do run into these folks like that all the time, you know, and we'll get them the one time, you know, could end up being a situation like that and then you never see them again.*
>
> MR. LINSKEY: *The supplemental report that it refers to, I'm assuming this would be the supplement?*
>
> CHIEF DONOVAN: *Yup, yeah, this was right up on the top so yeah, that's -- does it say who wrote it?*
>
> MS. SHANAHAN: *It says by -- oh,* ▆▆▆.
>
> CHIEF DONOVAN ▆▆▆ *yeah that's for Officer B but -- yeah, that is -- I believe I'd have to look and see whether it said in the report about who did the supplement.*
>
> MR. LINSKEY: *Yeah,* ▆▆▆*, I think.*

[8] Name inaccurately transcribed.



Drummond Woodsum

CHIEF DONOVAN: Oh, it was? Okay.

MR. LINSKEY: ███████ who completed supplemental report.

CHIEF DONOVAN: I don't know why it would have said for ███████, it should have said by, but --

MR. LINSKEY ███████████ --

CHIEF DONOVAN: It might be just how MC works.

MR. LINSKEY: On ███████ boyfriend of the arrestee submitted an email complaining about it. This report, the supplemental report that I think it -- I don't think there was a new supplemental report done after the complaint, I think he wrote the original supplemental report --

CHIEF DONOVAN: Probably.

MR. LINSKEY: -- from that night because it's dated ████,[9] so from ███████, Wednesday █████████████  █████████, FYI, and he sends ███████ the email complaint at 8:26 a.m. on the █████████ reviews it, looks like he reaches out to boyfriend of the arrestee at least once to shed more light on his claims, he's not heard back from, he attempted to contact her but the phone number listed is no longer in service, if boyfriend of the arrestee returns my call, and he writes a report back stating that basically boyfriend of the arrestee was not present when the alleged excessive force happened, I called, no one's got back to me and he received the complaint at 8:26 a.m. on the ███ and he's completed his report on the ███████ you think that could be a problem with giving a little more time for people to respond?

CHIEF DONOVAN: Again, you're looking at partial packages and stuff, there may have been more to this in the original package with the stuff that --

MR. LINSKEY: I'm exactly that -- I'm looking exactly what I have in front of me for documents.

CHIEF DONOVAN: This was probably in ███████████ file draw, again, and this is stuff -- you know, when you guys asked for this stuff these guys looked for -- they looked through to see what they could find and they even pulled out stuff that technically should not have been kept because this probably shouldn't have been kept.

MR. LINSKEY: Okay, but you'd agree --

CHIEF DONOVAN: So there might have been a complete package to this and now you're looking at just a piece of it.

---

[9] reading from an email



MR. LINSKEY: But you'd agree with me what we have in front of us it looks like the ▮▮▮▮▮ received the complaint at 8:26 in the morning and did an investigation where he reached out to two individuals, spoke with the officer, reviewed the reports, and is able to complete that form the same day.

CHIEF DONOVAN: Well if you can't get a hold of the people there's really no reason to hold on to it.

MR. LINSKEY: Well, if you left a voice mail, wouldn't you have waited a day or two to see if the person responded back?

CHIEF DONOVAN: I suppose you could have, yeah.

MR. LINSKEY: Left a message for Victim's boyfriend to call him, as of this writing I have not heard back from him.

CHIEF DONOVAN: Right, so if you do hear from him I suppose you can reopen it again or put an addendum to it.

MR. LINSKEY: You'd agree that's quick?

CHIEF DONOVAN: Yeah.

MR. LINSKEY: It looks -- it looks -- it look --

CHIEF DONOVAN: Oh it's -- it's quick, but you're asking about situations that happened years ago, you're talking about two more soup sandwiches that chances are not ever going to be seen here again, so yeah, we could spend a lot of time trying to track him down but I can understand why he didn't because they know where we are, if they relay (sic) want to file the complaint or they want to follow up they're more than welcome to come here and say what have you done so far.

MR. LINSKEY: Well they did --

CHIEF DONOVAN: But these are the people --

MR. LINSKEY: -- they did file a complaint, --

CHIEF DONOVAN: Right.

MR. LINSKEY: -- they filed a written email complaint.

CHIEF DONOVAN: But I'm saying these are people who have never come back here again and even wanted to know what was going on, so he probably filed the email complaint just because he was angry, which is fine, --

MR. LINSKEY: Sure.

CHIEF DONOVAN: -- I mean, I understand that, go ahead and do it, but they're not showing any interest in seeing this go anywhere either, so I think what he probably did was, you know what, if they want to come back, they can come back, and we'll do -- we'll deal with it some more, if not we'll just close it and move on.



*MR. LINSKEY: Do you think maybe a phone call the next day, maybe a letter to both of the individuals involved?*

*CHIEF DONOVAN: I don't think it's our job to go out there and solicit these things from people. If these people want to file a complaint, they can come in, they can sit down and give us the information, but for us to go out, we have a million and one other things to do, we don't have enough people to do what we have to do. Now, I mean I suppose if this was the perfect world and we had an IA division, which we don't have, it's done by a captain who's doing a million other things or by a shift lieutenant, yeah, if this was Hartford or Boston you'd have a professional IA unit and that's all they did was IAs I suppose they'd have the time to go out there and try to track people down and stuff, we don't. If they want to file a complaint they're welcome to file the complaint and we'll investigate it.*

*MR. LINSKEY: Well they did file a complaint.*

*CHIEF DONOVAN: Right, and we investigated it, and that's where it ended up.*

The Salem PD's handling of this incident exposes another example of the department's failure to follow its own IA investigative procedure. Not only is there an email alleging physical abuse while in custody, but there is also a complainant (albeit not the complainant that the Salem PD deems mandatory to submit the complaint) who does, in fact, submit a written complaint. The complete investigative report provided to Kroll consists of a report outlining the complaint and a review of the previously filed reports. There are no statements or supplemental reports from officers involved or notes of interviews. The case file reports that a voice mail was left informing the complainant that even though they submitted a written email complaint – that by policy would call for a full formal investigation – the girlfriend needed to come to the Salem PD to file a complaint on her own. The department's full investigation, which resulted in a not sustained determination relative to the complaint of physical abuse, occurs within hours.

While it is certainly possible that neither the complainant, nor his girlfriend, planned to follow up regarding the complaint, the Salem PD took no efforts to confirm that possibility. Best practice would call for the department to wait a day or two for a follow up call, send a certified letter to the complainant and alleged victim asking them to contact the investigator for follow up, interview the officers and document their version of events. This documentation of efforts is necessary to protect the officers, as well as the town, from future litigation, as well as to determine what truly happened and if any disciplinary action is needed.



Drummond Woodsum

Kroll further notes that all citizens should have the right to submit a complaint against an officer, and all officers should have the right to a fair and thorough investigation. The failure to properly investigate such allegations could lead to lawsuits placing the officers and the department in harm's way. It is also of grave concern that a Salem PD ██████ expressed contempt towards complainants, ignored the policy requiring fair and thorough investigations and has an attitude that his department is not under any obligation to make efforts to prove or disprove complaints against his officers, especially one involving alleged physical abuse while in custody.

> *CHIEF DONOVAN: Oh it's -- it's quick, but you're asking about situations that happened years ago, you're talking about two more soup sandwiches that chances are not ever going to be seen here again, so yeah, we could spend a lot of time trying to track him down but I can understand why he didn't because they know where we are, if they relay (sic) want to file the complaint or they want to follow up they're more than welcome to come here and say what have you done so far.*
>
> *MR. LINSKEY: Well they did --*
>
> *CHIEF DONOVAN: But these are the people --*
>
> *MR. LINSKEY: -- they did file a complaint, --*
>
> *CHIEF DONOVAN: Right.*
>
> *MR. LINSKEY: -- they filed a written email complaint.*
>
> *CHIEF DONOVAN: But I'm saying these are people who have never come back here again and even wanted to know what was going on, so he probably filed the email complaint just because he was angry, which is fine, --*
>
> *MR. LINSKEY: Sure.*
>
> *CHIEF DONOVAN: -- I mean, I understand that, go ahead and do it, but they're not showing any interest in seeing this go anywhere either, so I think what he probably did was, you know what, if they want to come back, they can come back, and we'll do -- we'll deal with it some more, if not we'll just close it and move on.*
>
> *MR. LINSKEY: Do you think maybe a phone call the next day, maybe a letter to both of the individuals involved?*
>
> *CHIEF DONOVAN: I don't think it's our job to go out there and solicit these things from people. If these people want to file a complaint, they can come in, they can sit down and give us the information, but for us to go out, we have a million and one other things to do, we don't have enough people to do what we have to do. Now, I mean I suppose if this was the perfect world and we had an IA division, which we don't have, it's done by a captain who's doing a million other things or by a shift lieutenant, yeah, if this was*



Drummond Woodsum

> *Hartford or Boston you'd have a professional IA unit and that's all they did was IAs I suppose they'd have the time to go out there and try to track people down and stuff, we don't. If they want to file a complaint they're welcome to file, the complaint and we'll investigate it.*

The residents of Salem and their officers are equally deserving of a professional IA process as are the citizens and officers of Hartford and Boston. This philosophy as to the obligations of the Salem PD to investigate complaints of excessive force could easily support a Monell[10] claim bringing liability under Section 1983 of Title 42 of the United States Code: civil action for deprivation of rights. The court, however, requires that a §1983 claim against a municipal entity be based on the implementation or execution of "a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that party's officers."[11] As such, this expression from Chief Donovan is extremely concerning.

This investigation **was not** compliant with the Salem PD policy. This investigation **did not meet** acceptable best practices for internal reviews.

### Internal Investigation (informal then formal): Officer S

A review of this incident shows an informal investigation when a formal investigation is clearly in order. Citizen W makes a formal complaint that he was racially profiled on ████████████████. In a memorandum dated ████████████, ████████████ states he informed Citizen W ████████████████ (the date the complaint was filed) that he ████████████] does not believe there was any basis of fact to his complaint. This causes one to speculate if this opinion, which was asserted prior to any investigation, could have influenced the outcome of the investigation. Certainly, this statement made Citizen W question the seriousness in which his allegation would be investigated.

On ████████████████ Citizen W comes to the Salem PD, meets with a ████████████ completes the complaint intake form, provides a written statement and alleges a civil rights violation and unlawful search. These elements would qualify Citizen W's complaint as a "formal complaint," according to General Order 65-3. ████████████████ was assigned to look into the events and provides a memorandum documenting a conversation with Officer S as to the events of the traffic stop and search. At no point is this incident investigated as a formal complaint. There is no notice given to the employee, and there is no documented

---

[10] https://caselaw.findlaw.com/us-supreme-court/436/658.html

[11] http://www1.law.umkc.edu/justicepapers//PembaurDocs/BrennanDocs/CI%20I-702-4/03-07-86%20LFP%20Dissent%204th%20Draft%20Dissent%20WJB702F40004.pdf

*Private and Confidential*



Drummond Woodsum

investigation other than a conversation with the officer. No IA number is issued, and it seems that Citizen W is sent a correspondence informing him that the allegation was without merit; the investigation was closed.

A formal investigation was initiated on ████████ (IA #03-16) by ████████. Based on the documentation provided, it appears Citizen W, again, files a complaint in writing. Citizen W goes over the details of the event from the initial complaint, which are almost identical to his first statement, and states that when he responded to the police department to make the complaint against the officer who coerced him into signing the consent form, he "was met with hostility." He also states that the lieutenant tried to talk him out of filing a complaint. Citizen W stated that upon insisting on filing a complaint, he was "reluctantly" given the forms, and that upon completing the paperwork, he met with Supervisor B and was told "nothing" was going to be done about the complaint. He further states that after he filed the complaint, Supervisor B told him not to return to Salem and threatened to arrest him if he did not leave the department. It is very concerning to believe a citizen bringing forth an allegation of police misconduct would be treated in such a manner.

When Supervisor B receives the written notice from ████████ that a formal investigation will be conducted into Citizen W's complaint, Supervisor B responds in an email to Chief Donovan that the allegation is outside the six month timeframe allowed in the CBA. As mentioned earlier, the six month investigative restriction is for the contract covering sergeants and officers. That restrictive verbiage does not appear in the contract covering police lieutenants, captains and deputy chiefs. However, Kroll was told that it has been applied as a past acceptable practice. Based on the chief's response, the chief agrees that Lieutenant B is protected by contract from being subject to an investigation that is beyond the authorized six month period. Supervisor B goes on to assert that human resources is out of line in bringing concerning matters to the attention of the police department. Clearly both the officers and the administrators CBAs recognize the towns authority as the ultimate supervising body in management rights. The way this allegation was handled from the initial reporting of the incident through the second reporting has major areas of concern in the integrity of police operations. There are concerns in areas of making the complaint process reasonable for members of the public, the handling of formal complaints in accordance with policy. It is also concerning that police management does not seem to respect or regard human resources as a cooperative entity working to protect the integrity of municipal operations. Instead, there seems to be some disdain for input received from outside the police agency in police matters. This could potentially compromise public trust and allow for an environment where the police remain unaccountable for potential unethical conduct or questionable behavior.



Drummond Woodsum

Supervisor B stated the following regarding Citizen W complaint:

> MR. LINSKEY: All right. Citizen W. (named change throughout for confidentiality)
> Supervisor B: Yeah.
> MR. LINSKEY: Two complaints, one I think you handled, one he complained against 
> Supervisor B: Eight months later.
> MR. LINSKEY: So Citizen W complains, there's a car stop, the officer stops him, he's going to seize his car, get a search warrant, Citizen W leaves, comes back with a tow truck, he comes in and complains about the officer, makes a statement about black lives matter, no, he makes --
> Supervisor B: No.
> MR. LINSKEY: -- a statement about -- concerning he wanted it on record in case the police officer shot an innocent black person, and then he had a conversation with you, I think you had some conversations about the dangers of officers, things going on, tensions these days, things that go on, and then at some point he was -- left the station, he has his version of events of why he left the station, I'm more interested in the investigation you did of Citizen W complaint. What did you think of that, what -- so he's written a formal complaint, this -- and this is -- so –
> Supervisor B: He -- he came in, I met with him, the -- the two -- it was like 2 o'clock in the morning, he feels that the officer stopped him because he was black. It
> was 2 o'clock in the morning, traveling in an opposite direction, the officer pulled him over for speeding. The officer felt that he detected an odor of marijuana emanating from the car, saw an ashtray full of cigarette butts, asked for consent to search. Consent to search is not granted, the officer informs him that he is going to tow his car and apply for a search warrant, guy walks a little ways down the street, comes back and decides he doesn't want his car to get towed, gives the officer consent. The officer searches the car, finds nothing. He doesn't give him a summons, he doesn't give him -- he doesn't arrest him, so I said -- and his complaint was racial profiling. So I said, okay, sir, did he use any racial slurs? No. Did he swear at you? No. Was he rude to you? No. Did he put his hands on you? No. I said, okay, I'm not -- I'm not seeing the nexus here; what is it that you'd like to see done. He says, I want this documented in case that white cop kills a black guy. I said okay, sir, have a nice day. I document it all, I take the next step because the officer is going to need a little bit more than the smell of marijuana and an



Drummond Woodsum

*ashtray full of butts, I assign it to his lieutenant to do some retraining with him on that and discuss what he needs, all of that is sent to Citizen W, all of it, and I --*

*MR. LINSKEY: So, he gets all of that in a letter?*

*Supervisor B: All of it; okay? Eight months later the complaint is virtually the same except for the fact that I threw him out of the station saying, all you people and your black lives matter are whatever, whatever, whatever he said. Now, this is a classic Molly McCain,[12] former HR Director, sticking her nose where it didn't belong because she's the one that gets the complaint, she raises holy hell; okay? I believe the original complaint came in December --*

*MR. LINSKEY:* ▮▮▮▮▮▮▮▮▮▮.

*Supervisor B: December, and when did Ferguson happen, August of '15?*

*MR. LINSKEY: August of '14, wasn't it?*

*Supervisor B: I think it was '15.*

*MR. LINSKEY: Yeah -- no, November of '15 is when the verdict came out, I think.*

*Supervisor B: Okay. But the actual incident happened in August.*

*MR. LINSKEY: Yeah.*

*Supervisor B: Okay. So, no mention of that in his original complaint and then eight months later all of a sudden, it's a complaint* ▮▮▮▮▮. *So, Molly was dealing with this, calls then* ▮▮▮▮▮▮▮▮▮▮▮, *says that we need to look into this matter and this is an IA number that was assigned that should have been rescinded, but it never was so that's why we sent it to you. So, I get notification that there's going to be an IA* ▮▮▮, *I send an email to the Chief and say I understand that there's been an IA, however it's more than eight months old per CBA, you know, it's -- you can't -- can't do that, however,* ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *The Chief concurred with my assessment,* ▮▮▮▮▮▮▮▮ *sent Citizen W notification that we would not be looking into his second complaint, which was the same as the first except he didn't get his pound of flesh that he wanted in his first crack, so he was trying a second crack. It never happened. Did I tell him, okay, sir, have a good day, why don't you move along? Yes, I did. Why? Because the complaint was not valid, there was no reason for for the complainant to documentation in case this white cops kills a black -- I mean, it's just foolishness and in addition to hearing his complaint, taking his complaint, I also noted that the officer was a little overzealous and did not have -- he*

---

[12] Transcriber incorrectly spelled this individual's name.



Drummond Woodsum

*wouldn't have got a search warrant based upon an order of mari -- so I had retraining done with him, which is all documented.*

*MR. LINSKEY: So -- so you were concerned about the officer, that, like, you really didn't have the ability to get this guy out of his car and tell him you're getting a search warrant?*

*Supervisor B: Cor -- well, he didn't, and he needed some retraining on that, which is exactly what happened, but the complaint was for racial profiling, --*

*MR. LINSKEY: Racial profiling.*

*Supervisor B: -- which, I mean, 2 o'clock in the morning he knew it was a black guy, and the guy said it --*

*MR. LINSKEY: I mean, the only -- the only thing I would point to that, and I don't think it's there, is he said he saw the car at the, you know, that he was familiar with this particular car, so, you know, was he (inaudible at 1:10:02, low audio) the car and the operator at the Red Roof Inn or just the car? So, he -- the reason he says he pulled the car over is he was familiar with this car involved in something, so I don't know if he -- and, you know, I don't know if he ran MDT and he -- he saw a photo, I mean, that's the only way he could make the --*

*Supervisor B: But he --*

*MR. LINSKEY: -- the racial profiling if he'd seen him before with the car.*

*Supervisor B: But he was speeding too, which is why he made the stop. When he made the stops he's familiar, and -- and this white Cadillac that he's talking about, not a nice Cadillac, it was an eight-five Deville or something like that.*

*MR. LINSKEY: Okay.*

*Supervisor B: And the gentlemen is from Pennsylvania, doesn't reside in New Hampshire, stays at the Red Roof Inn when he comes to town to do his business, ████* ████████████████████████████

*MR. LINSKEY: Sure.*

Kroll's summary of the incident is as follows:

The complainant, Citizen W, comes to the Salem PD and submits a formal written complaint regarding his being stopped by an officer. The complainant claims he was stopped for no other reason than his race. He is made to exit the vehicle, his vehicle is impounded for a search warrant and he is forced to walk. He returns later and reluctantly provides consent to search the vehicle. A search is conducted, and no evidence is seized; the complainant is allowed to drive away.



Per Salem PD policy, Citizen W is provided with a written form to complete relative to his interaction with the officer. Citizen W completes and signs the form; however, instead of his complaint being taken and forwarded to the chief, per the policy, Supervisor B enters the room and speaks to him about his complaint. According to Supervisor B, Citizen W states, "I want this documented in case that white cop kills a black guy." Supervisor B takes offense to that statement saying, "Okay, sir, have a nice day. Why don't you move along?" No investigation is conducted, and the complainant is made to leave the police station. Supervisor B says the complaint is "foolishness." However, Supervisor B did observe that the officer did not have probable cause to order the subject out of the car, seize the car or search the car. He orders remedial training for the officer.

Kroll notes that Citizen W may have asserted that the officer's actions were based on race. Citizen W may have stated that he wanted his assertion to be documented in case of a future event with the officer and an African American individual. That is entirely his right. Despite Citizen W exercising his right to issue a formal complaint on what he perceived to be racial profiling, Supervisor B turns him away from the station and tells him nothing will happen with this complaint. This occurs even though Supervisor B agrees that the officer overstepped his bounds and did not have probable cause to order him out of his car, seize his vehicle or conduct a search.

Supervisor B made an automatic determination that it was inconceivable that Citizen W was racially profiled, noting that it was 2:00 a.m. and the vehicles were traveling in opposite directions, rendering it impossible for the officer to determine Citizen W's race. It is Kroll's opinion that it is actually easier to see the race of an operator when traveling in different directions then when following from behind. However, this allegation should have been investigated in the IA formal complaint. Both Citizen W, via his allegations, and Supervisor B, via his acknowledgment that the officer required remedial training, were in agreement that the officer's actions were out of policy and were done without cause. No effort was made to determine if the officer had any prior experiences with Citizen W in which he would have known the complainant's race. The officer states that he stopped Citizen W for speeding but says that he had previously seen the vehicle at the Red Roof Inn, ██████████████████████. No inquiry was made to determine whether the officer had previously run the complainant's license plate on his MDT Terminal, which would also reveal the complainant's race. It does appear, however, through Supervisor B's comments that the Salem PD believed Citizen W was involved in illegal activity at the Red Roof Inn. If there are anonymous complaints about his activities or reliable information of other citizen complaints, observations and encounters with law enforcement relative to Citizen W, all of this would be appropriate information to include in an investigative case file and aid in the department's not

**Kroll.** | A Division of **Duff&Phelps**                    Drummond Woodsum

with the lieutenant from Methuen PD. There is the concerning statement, "Officer T had been disciplined on four other occasions in the past year," made in the findings section of this incident. It should be noted that no documentation for any of these mentioned incidents was included in the materials presented for this assessment. The allegations in this investigation were sustained with Officer T receiving one day suspension without pay and recommendation for a stress management training course and a performance improvement plan designed to assist this officer with job performance.

This investigation *was* compliant with the Salem PD policy. This investigation *did meet* acceptable best practices for internal reviews.

### Internal Investigation (formal) IA #16-04: Officer B

A review of this formal investigation shows ██████████ being assigned to conduct a formal investigation on Officer B based on alleged misconduct occurring on ██████████. The allegation is that Officer B was insubordinate to ██████████ during a debrief on a call for service and failure to obey lawful orders. Interviews were done with all involved parties and witnesses, and the packet contained the police report from the call for service, as well as a CD of radio transmissions. The findings were sustained, and Officer B was issued a two-day suspension without pay.

This investigation *was* compliant with the Salem PD policy. This investigation *did meet* acceptable best practices for internal reviews.

### Internal Investigation (formal) IA #17-05: Civilian D

A review of this investigation shows a formal inquiry conducted by ██████████ into attendance issues involving Civilian D between ██████████. The investigation uncovered a pattern of behavior possibly related to a medical issue. The employee was under the care of a physician and was making changes to ███ prescribed medication in attempt to correct the behavior. The allegations were founded with a recommendation that no discipline be issued for six months to see if the issue could be corrected under the care of Civilian D's physician. An additional event occurred on ██████████ and resulted in a written warning. This investigation appears to be complete with all documentation of the investigation provided.

This investigation *was* compliant with the Salem PD policy. This investigation *did meet* acceptable best practices for internal reviews.



Drummond Woodsum

sustained recommendation. However, if it existed and was more than just a hunch that he was involved in illegal activity, Kroll believes such information would have been presented. As the case files stands, the complaint against the officer is unchallenged due to a lack of proper and comprehensive investigation. Citizen W alleges he was detained and made to exit his vehicle without cause and that when he went to sign a formal complaint, he was told his case would go nowhere and Supervisor B threw him out of the station. Supervisor B agrees that Citizen W was correct when he was detained and had his vehicle searched without cause requiring remedial training for the officer. Supervisor B also agrees he found the complaint foolish and told the complainant that he was done and had him leave the station.

This investigation **was not** compliant with the Salem PD policy. This investigation **did not meet** acceptable best practices for internal reviews.

### Internal Investigation (formal) IA # 01-16: Civilian C

A review of this incident shows the formal investigation initiated by ▮▮▮▮▮▮▮▮. An investigative report cover sheet is displayed on top of the packet. In reviewing the contents of the investigation, it appears the investigation follows best practices, general orders and the terms of the CBA. The Salem PD learned from the Federal Bureau of Investigation that Civilian C used the SPOTS system for personal use. Civilian C was placed on paid administrative leave on ▮▮▮▮▮▮ after the agency learned of these allegations. That status was changed on ▮▮▮▮▮▮ to unpaid administrative leave effective ▮▮▮▮▮▮. Civilian C submitted a letter of resignation prior to the unpaid leave taking effect. Accompanying the letter of resignation from Civilian C was a letter from Union Vice President Michael Verrocchi. This letter discusses two weeks' pay and health benefits being extended to Civilian C as part of a negotiation related to her resignation. This was the only element of the investigation that was out of the ordinary. Since the contents of that negotiation is not discussed in any part of the documentation of the internal investigation, the reasons for such an agreement remain unknown.

This investigation **was** compliant with the Salem PD policy. This investigation **did meet** acceptable best practices for internal reviews.

### Internal Investigation (formal) IA #02-16: Officer T

A review of this formal investigation shows an investigation conducted by ▮▮▮▮▮▮▮▮ on ▮▮▮▮▮▮, which references the conduct of Officer T on a call for service. During this call, Officer T called the supervisor of Methuen PD and engaged in a verbal argument about jurisdictional issues. A complete investigation into the incident is documented including an audio recording of the phone call



Drummond Woodsum

Kroll. | A Division of
DUFF & PHELPS

Drummond Woodsum

**FORMAL COMPLAINT** – A complaint received under the above guidelines that is submitted in writing, where the complainant is available for follow-up investigation, interview, and/or the complaint alleges criminal misconduct or similar serious offense.

**INFORMAL COMPLAINT** - A complaint, as defined above, that is received anonymously, or by an identifiable subject not seeking action but supplying the information as advisory, to be used as see fit. Informal complaint, during the course of review, may become Formal Complaints if a complainant steps forward and files a more in-depth report, or if circumstances or information dictate an a more in-depth investigation is appropriate.

**INTERNAL COMPLAINT INVESTIGATION (ICI)** – The action taken on a complaint. This in-depth, thorough investigation requires an ICI number assigned, full documentation of all action taken, with all factual information gathered forwarded to the Chief of Police for review and discipline, if deemed necessary.

Kroll.
A Division of
DUFF&PHELPS

Drummond Woodsum

[13] ████████████████████████

[14] Attorney ████████████

[15] The Right to Know Law RSA 91-A:4 grants all citizens the right to access public records.

Drummond Woodsum



Kroll.
A Division of
DUFF&PHELPS

Drummond Woodsum

Drummond Woodsum

Drummond Woodsum

**Kroll.** | A Division of DUFF&PHELPS

Drummond Woodsum



Drummond Woodsum



**Kroll.** | A Division of
**DUFF&PHELPS**

Drummond Woodsum

The police reports suggest that police had been called to a fight at the Icenter. One of the officers reported that upon arrival, he was told that there was fight in the lower rink involving parents. He saw a crowd of people yelling, and noted that Sgt. Bagley, who was surrounded by people, pushed a man while ordering him to get back. The officer saw Mr. Andersen yell something at Bagley and take a step toward him with raised hands. The officer believed that Mr. Andersen was going to assault Sgt. Bagley. The officer ran up, grabbed Mr. Andersen, and began to pull him away from the crowd. Mr. Andersen began to "violently thrash around." Other officers arrived and assisted. Because Mr. Andersen continued to struggle and thrash, one of the officers used his Taser.

In his report, Sgt. Bagley indicates that when he entered the lower level of the rink, he walked into a crowd of 40-50 people. He saw two men, who he later determined were Mr. Griffin and Mr. Andersen, standing face to face. Mr. Andersen had both arms raised above his head. Sergeant Bagley believed that there was "animosity" between the two. He told Mr. Andersen to back off, but Mr. Andersen did not move. Bagley walked between the two and told Mr. Andersen to "back off" while pushing him. According to Sgt. Bagley, Mr. Andersen appeared angry and walked toward Bagley in an aggressive manner. At this point, a second officer grabbed onto Mr. Andersen and physically removed him from the area. Mr. Andersen was "twisting" and tried to pull away. He was ultimately tased. According to the reports, two of the officers were injured by Mr. Andersen during the struggle, one sustaining a cut in his mouth.

The Criminal Justice Bureau investigates allegations of criminal misconduct against State, and in some circumstances, local public officials. We will conduct an investigation when there is reason to suspect that a crime has occurred. Given the evidence summarized above, I cannot conclude that there is such reason here. Even if, as your witness statements suggest, Sgt. Bagley was mistaken about the nature of Mr. Andersen and Mr. Griffin's interaction, there is insufficient evidence to indicate that Sgt. Bagley's belief was unreasonable. *See* RSA 627:5.

Attorney DiBella, if you have any questions, please don't hesitate to call. As I mentioned when we spoke, I have referred your complaint and materials to the Salem Police Department for administrative review.

Sincerely,

Lisa L. Wolford
Senior Assistant Attorney General
Chief, Criminal Justice Bureau

Cc:   Gordon J. MacDonald, Attorney General
      Jane E. Young, Associate Attorney General
      Patricia Conway, Rockingham County Attorney
      Paul T. Donovan, Chief, Salem Police Department

**Kroll** | A Division of
DUFF&PHELPS

Drummond Woodsum

**ATTORNEY GENERAL**
**DEPARTMENT OF JUSTICE**
33 CAPITOL STREET
CONCORD, NEW HAMPSHIRE 03301-6397

GORDON J. MACDONALD
ATTORNEY GENERAL



ANN M. RICE
DEPUTY ATTORNEY GENERAL

March 9, 2018

Chief Paul T. Donovan
Salem Police Department
9 Veterans Memorial Parkway
Salem, NH 03079

Dear Chief Donovan,

On February 27, 2018, we received a complaint from Attorney Chris Dibella concerning an incident involving Salem officers, which occurred at the Salem New Hampshire Ice Center on December 2, 2017. Attorney Dibella's client, Robert Andersen, was charged in connection with the incident. Dibella alleged, amongst other things, that a Salem officer shoved Andersen and told Andersen's wife to "shut the f*** up."

I am referring this matter to you for what action you deem appropriate. Enclosed on disc are the documents and video provided by to this office Attorney Dibella, and the report generated by the New Hampshire Department of Justice investigator who took Attorney Dibella's call.

If I can be of additional assistance, please let me know.

Sincerely,

Lisa L. Wolford
Senior Assistant Attorney General
Chief, Criminal Justice Bureau
(603) 271-3671

LLW/mmp
Enclosure
1964913

Telephone 603-271-3658 • FAX 603-271-2110 • TDD Access: Relay NH 1-800-735-2964

*Private and Confidential*

**Kroll**. | A Division of **DUFF&PHELPS**

Drummond Woodsum

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
█████████████████████████

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
██████████████████

**II. POLICY:** All complaints will be accepted and documented. Any investigation based on a complaint will be conducted in an open and fair manner, with the truth as the primary objective. The Salem Police Department shall accept all complaints against their employees and will fully investigate all such complaints.

All violations of Department Rules and Regulations, Code of Conduct, Policies and Procedures, and all other directives which occur shall be dealt with in a fair and impartial manner, and in accordance with the Collective Bargaining Agreements in place with the Town of Salem. In all cases where disciplinary action is taken, the employee shall receive a copy of the documented discipline issued. (26.1.4)

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
███████████████████

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████



Drummond Woodsum



Drummond Woodsum



This investigation *was not* compliant with the Salem PD policy. This investigation *did not meet* acceptable best practices for internal reviews. Not only did this investigation not meet acceptable best practices, but these actions undermine the integrity of the Salem PD. Further, it is Kroll's opinion that there was a significant failure by the department's leadership in their accepting this investigation as a complete effort.

### Internal Investigation (formal) IA #18-01: Officer BB

A review of this formal investigation from ▟▟▟▟▟ shows that ▟▟▟▟▟ investigated a failure of Officer BB to keep a current certification ▟▟▟▟▟, as well as payroll inconsistencies related to training dates. The findings of failure to maintain narcotics certification was sustained, as well as a finding of failure to keep required department records. The allegations of collecting pay for training days without being in attendance were unfounded. Despite the sustained findings of two policy violations, it is unknown what discipline, if any, was recommended or issued to Officer BB, as there is no documentation of such with this packet.

This investigation *was* compliant with the Salem PD policy. This investigation *did not meet* acceptable best practices for internal reviews, as it lacked documentation.



Drummond Woodsum

When asked about an investigation that was assigned to him for investigation, ████████████ stated the following:

████████████: -- but it is the same officer, the one that was up at Walmart he identify -- he transposed the license plate numbers later on, like, through -- throughout his report transposed the license plate numbers, vehicle didn't match, so I'm -- I'm actually jumping ahead one, vehicles didn't match, he then identified the operator from the second vehicle, the one that didn't match --

MR. LINSKEY: Yup.

████████████: -- in all his other reports and was in the process of -- had filed a -- an arrest affidavit and pulled an arrest -- arrest warrant but had not had it signed and that suspect was not the same suspect. And then the other one was a shoplifting, I believe, at Home Depot, identified the suspect without any follow up, arrest -- he was arrested and come to find out he was actually in the hospital at the time of -- of the thefts and had served ten days in jail.

MR. LINSKEY: What was -- what was your investigation in that one?

████████████: That one was speaking to -- spoke to the officers that were involved.

MR. LINSKEY: How did it come in; how did the complaint come in?

████████████: That complaint came in internally. One of our sergeants or lieutenants was in the courtroom when they had the -- it was a probable because hearing, so he was in the report room, it was either the arraignment or the probable because hearing, and the guy went up -- went on record to the Judge saying this isn't me, I haven't been in Court in so long, I was actually in the hospital during this period, they have the whole thing. So, whatever -- again, without reviewing it and knowing everything that was said, it was -- it was along those lines that the lieutenant — lieutenant came back and said hey I think we have a problem with this arrest based on what -- what was said in Court today, and we started to look into it.

MR. LINSKEY: And what was your -- what was your process you used for that investigation?

████████████: That one we used -- I interviewed him, he was read Garrity, he was -- he was interviewed, that one was taped, and that one was done, and the union rep was there for that. Then I did --

MR. LINSKEY: Do you transcribe the tapes?

████████████: We don't.

MR. LINSKEY: Okay.



███████████: *We don't send it out. And that one I went up to contact the guy who was arrested, he was homeless, he was living in a homeless shelter up in Manchester, I went up there, left my card with the shelter in Manchester, asked them to -- if -- if he comes back in, can you have him call me. He did come back in, they called Manchester PD, while they gave him the card he said I'm not calling him, they called Manchester PD said, hey Salem was up here looking for him, I'm not really sure what they want, Manchester went to look for him and he -- he -- he -- we haven't really been able to find him since.*

███████████ efforts were in keeping with best practice. It should be noted that in what was to be a complete copy of the IA file provided to Kroll, there was no Garrity form submitted and signed by the officer. There were also no audio recordings of the interviews provided.

Captain Dolan noted that if there is a crime, even older than six months, that the appropriate action would be to refer the complaint to the Attorney General's Office:

> *MS. KING: Okay. Al right, so do -- just one other question, and this is kind of out -- outside of the process it's actually at the inception of the process, so I read in the union contract that a formal complaint must be things that occurred within the last six months?*
> ███████████: *Correct.*
> *MS. KING: Okay. So -- so if somebody came to you with a complaint that happened last year, how would you handle that from the intake process; is that just -- is it documented, is it automatically discounted because per the union contract it doesn't meet the parameters?*
> ███████████ *Well, if it's a crime, we would probably send it to an -- the Attorney General's office to investigate because even though by union we can't, if you're still in office and you did it under the color of law then the Attorney General's office would still have some oversight over that, so*
> *MS. KING: Okay.*
> ███████████ *-- so if it's a criminal matter we -- we would pass it on. if it's a policy matter, it's one of those that we -- we would take it in, we would document it, but it would really be nothing procedural wise that we would be able to -- to do much with.*



Drummond Woodsum

# 6. Kroll's Communications with External Citizens

Shortly after being engaged to conduct an audit of the Salem PD's IA investigative process, Kroll recommended that the town issue an announcement soliciting positive or negative comments from the public. A decision was made not to issue such an announcement to avoid a perception that complaints were to be re-investigated independently by Kroll, which was not in the scope of our investigation. As such, Kroll did not seek out citizens but was contacted by several citizens – in an unsolicited manner – who wished to speak regarding concerns, as well as positive interactions, with the Salem PD. Kroll made every effort to afford these individuals with an ability to be heard and represented in this review.

1. Kroll spoke with a complainant, The Complainant, who attempted to file a complaint against Supervisor B for threats, harassment and unprofessional behavior. According to a conversation with The Complainant, she called the Salem PD and spoke with a supervisor, who convinced her not to file a complaint.

   According to The Complainant, ███████████ was the officer she spoke to over the phone relative to filing a complaint against Supervisor B. She told Kroll that her son had accompanied ██████████████████████████, and it was prior to the ████ that the alleged harassment occurred. According to The Complainant, ██████████ convinced her not to file a complaint. She also told Kroll that there was a second instance of alleged harassment and unprofessional behavior by Supervisor B for which she did not bother discussing with the Salem PD, as she felt nothing would be done.



Drummond Woodsum

Kroll. | A Division of DUFF&PHELPS

Drummond Woodsum

Kroll. | A Division of DUFF&PHELPS

Drummond Woodsum

Kroll. | A Division of DUFF&PHELPS

Drummond Woodsum

Drummond Woodsum



Drummond Woodsum

2.  Kroll spoke to a gentleman who was stopped at a construction site by officers directing traffic. The caller was a law enforcement official with another law enforcement department. He told Kroll that he was yelled at and subjected to profanity and insults by two officers at the construction site. The caller did not inform the officers that he was a 20-plus year veteran of public safety, but told Kroll that he felt the Salem PD needed to increase diversity in the ranks and better train in how to engage with citizens. This caller went to the Salem PD to file a complaint and spoke with ▮▮▮▮▮▮▮▮ and ▮▮▮▮▮▮▮. He expressed that they apologized for the officers' actions and addressed the issue with those involved. The caller was pleased with their responsiveness and professionalism and decided not to file a formal complaint.



Drummond Woodsum

- Kroll notes that this complaint was handled to the complainant's satisfaction. It was not identified in the documents provided to Kroll and was not recorded or otherwise tracked. This complaint should now be entered in Guardian for future reference.

3. Kroll was contacted by a law enforcement official who wished to remain anonymous. The caller stated that they had observed individuals taken into custody by Salem PD within the past five years, and that it was their opinion that the Salem PD used excessive force resulting in significant injury during an arrest. They told Kroll that when the victims went to the Salem PD, they were dissuaded from filing a complaint.

- This complaint did not appear in any of the documents provided to Kroll. If accurate, reports of excessive force must be given the highest level of review. This complaint should have been documented and elevated to a formal complaint for thorough investigation. Under no circumstances should officers have dissuaded a citizen from filing such a complaint.

4. Kroll spoke with a citizen who alleged improper arrest and excessive force that they had reported to the Salem PD without satisfaction. They indicated that they wanted to share the complete account but wanted to speak to their attorney first. That individual did not reach out to Kroll again.

- Kroll was not provided with any documentation as to this case by the Salem PD or by the complainant and is, therefore, unable to evaluate its merits.

5. Kroll was contacted by a citizen who alleged that they had attempted to file complaints with the Salem PD regarding, what they felt, was a failure on the part of some officers to enforce a ████████████. The complainant alleged that there was a personal friendship with some of the officers and the subject of ████████████████ which was the reason for the inaction. The complainant expressed significant concern for their safety.

- Kroll was not provided with any documentation of this matter by the Salem PD. During its interviews, Kroll learned that one of the supervisors was aware of the complaints/concerns raised by the complainant, and a supervisor at the Salem PD did have some limited interaction with the subject ████████████████. According to the interviews, the Salem PD believed that the subject did not violate the ████████████████████ obtained by the complainant and advised the complainant to address their concerns with



the court. This information was not documented at any time. However, it is Kroll's understanding that this type of interaction would now be captured by Guardian.

6.  Kroll was contacted by ███████████████████, who reported that the internal affairs process was generally fair and thorough but that complaints filed against supervisors were not taken seriously and not handled properly.

    • Kroll's review of provided IA case files (noted above) indicate that this comment has some merit. However, it is Kroll's belief that not all complaints against those in a supervisory role are taken less seriously or not handled properly, as there are instances included above whereby supervisors were terminated or resigned as a result of the investigation. Kroll did find instances in which complaints against supervisors were not handled in accordance with the Salem PD policy and were not investigated in a fair and thorough manner, with some resulting in discriminate treatment among department personnel.

7.  Kroll spoke with a complainant who reported that a family member was arrested by the Salem PD without cause. The complainant attributed the arrest to a relationship that the alleged ████ ██████████████. The complainant alleged that the family member attempted suicide while in custody and that the department did not document the suicide attempt or seek medical intervention. They reported contacting the department and being told that they needed to come in and submit a formal complaint, but although the complainant told the department that they were fearful to go to the station, they were told it was the only way to file a complaint.

    • Kroll was provided no documentation of this complaint and can make no evaluation as to its merits.

8.  Kroll was contacted by a complainant who had an interaction at their home with several members of the Salem PD, including ███████████. The complainant alleged that they were arrested without cause and that family members were threatened with arrest. The complainant stated they were then released from custody after agreeing to allow officers to speak with a sleeping family member ("suspect") who was suspected of a crime. The complainant alleged that they were coerced into allowing the officers into their home, and that they arrested the suspect. The complainant also alleged that there were illegal searches conducted of the suspect's dresser drawers, as well as unprofessional language and conduct by some of the officers on the scene. The complainant alleged that the suspect's arrest was predicated on the



Drummond Woodsum

suspect's ████████████████████████. They also alleged that unethical prosecutorial actions were taken by ████████ and others and that since the arrest of the suspect, police cars, which never previously patrolled the complainant's neighborhood, were frequently passing by their home in what they alleged were efforts to intimidate the family. The complainant further alleged that the suspect was coerced into pleading guilty to a misdemeanor and accepting a reduced sentence after being threatened with incarceration if they did not.

Subsequent to the complainant bringing a complaint against ████████, the complainant alleged that they and ████████ attended the same party, at which ████████ stared at the complainant in an intimidating fashion. Shortly thereafter, this complainant sought counsel from law enforcement friends who informed them that if they filed a complaint with the Salem PD, nothing would be done. The complainant then contacted Town Manager Dillon for assistance with their complaint. The town manager informed the complainant to formalize the complaint in writing and send it to him so that he could forward it to Chief Donovan. The complainant drafted the written complaint later that day and sent it to the town manager.

The complainant told Kroll that no one from the Salem PD had contacted them or any of their provided witnesses. They, at one point, learned that the complaint had been forwarded to the Attorney General's Office for review, at which time they spoke with the Attorney General's investigator, who stated that they determined no criminality but that they referred the complaint back to the Salem PD for an administrative review.

- Kroll was provided with documentation as to this matter, along with a letter to Chief Donovan from ████████ that stated he was providing this information, as well as information regarding a previous incident that resulted in sustained finding despite it occurring outside of the time period that Kroll had requested. The ████████ provided several documents, including the written complaint forwarded to Chief Donovan by Town Manager Dillon. He stated that he denied the allegations in the complaint and had waived his right to have it investigated by the Attorney General's office even though it was his belief that the town manager violated the CBA by taking the complainant's phone call, recommending that the complainant issue a written complaint and forwarding the complaint to the chief for a review. ████████ stated in his document to the chief that this was his only internal affairs complaint filed against him.



Drummond Woodsum

During an interview ███████, he spoke as to the complaint's allegations. Therefore, while Kroll was not tasked with investigating this complaint, ████████ wanted to speak on the record as to the allegations.

Kroll spoke with the complainant and ████████, and while there are a lot of similarities between the accounts, there are some disputed points in each version. This complaint was submitted in writing by the complainant via the town manager to the chief. The chief did not initially conduct an investigation and stated that he was unable to conduct an investigation as the town manager violated the CBA by allegedly investigating the complaint and conducting his own interviews. The town manager denies doing anything other than speaking to the complainant and informing them to put their concerns in writing and then forwarding that written complaint to the chief.

As noted, initially, the chief refused to document the complaint or conduct an investigation. However, after meeting with the town manager and Attorney Broth, the chief reluctantly sent the complaint to the Attorney General's Office for a review. The Attorney General's Office reviews the complaint on its face for criminality and declines jurisdiction, referring it back to the Salem PD for an administrative review. It is standard process for the Attorney General or district/county prosecutor to review complaints for criminal violations, and if they determine no clear criminal violations, to refer the complaint back to the local jurisdiction for a review of administrative concerns, such as violations of rules, regulations or procedures. In this case, the matter was sent back to the Salem PD for further review, which did not happen. This is not in keeping with law enforcement best practice. Kroll further notes that ████████ cannot waive his right to an Attorney General's review, as the Attorney General is not bound by any labor contract.

The chief told Kroll that he did not conduct an investigation because the town manager had violated the CBA by conducting his own independent investigation. However, as noted previously throughout this report and on the Salem PD's complaint form (included below), there are several methods by which a complaint can be brought to the department's attention. Of the listed ways, the Salem PD can receive a complaint through an outside source, noted as "BOS [Board of Selectmen], Town Mgr. [Town Manager]."

**Kroll** | A Division of **DUFF&PHELPS**

Drummond Woodsum

## Complaint Intake Form

ICI File #: _____

Name of Complainant _____

Address _____

_____

Phone Number _____     Date of Incident _____

Employee Names _____     _____

Alleged Misconduct _____

_____

   The following will be presented to an identifiable complainant by the Supervisor receiving the complaint and/or Assigned Investigator for review and signature. A refusal will have an appropriate weight placed on it during the investigation.

### STATEMENT OF AFFIRMATION

   I, _____, do hereby affirm that the attached information is true and complete to the best of my knowledge and belief. I understand that false, misleading or untrue statements, accusations or allegations, herein made by me, either orally or in writing to any person investigating this complaint may subject me to civil and/or criminal prosecution.
   I further realize that it may be necessary for me to meet with investigators or others to discuss this complaint. I understand that my testimony before a court or other administrative hearing may be required. I hereby agree to make myself available for such hearings or court upon reasonable request.

_____     _____
Complainant Signature                            Witness

•••••••••••••••••••••••••••••••••••••••••••••••••••••••••

Method Received:                                 Complainant advised of our procedures in
Telephone _____                                conducting investigations  Y _____ N
In Person    _____
By Mail      _____                             _____   _____
Written Statement _____                        Date                    Time
Outside Source _____
(BOS, Town Mgr, rec'd complaint) _____         _____
                                                 Receiving  Supervisor

                                                 _____
                                                 Reviewed              Assigned to

GO# 65-3, Attachment A



Drummond Woodsum

Kroll was not provided any prior arbitration or case law that supports the Salem PD's assertion. Further, by failing to document the complaint ███████ violated the policy of the Salem PD, and by not conducting a fair and thorough investigation, ███████ violated the policy of the Salem PD.

███████ failed to conduct an investigation or review to substantiate his statement that the town manager violated the CBA, and only after Kroll informed the chief that Town Manager Dillon simply accepted a phone call from the complainant and directed them to formalize their complaint in writing, did the chief changed his stance from there being a violation of the CBA to a failure to submit a formal complaint at the Salem PD, which Kroll disputes is unnecessary for all of the reasons set forth elsewhere in this report.

It is Kroll's belief that these actions are not in keeping with the Salem PD policy and reflect negatively on the Salem PD. These actions confirmed what the complainant alleged, which was that no investigation would be conducted. This is an abdication ███████████ and responsibilities and a failure of the complainant's rights for due process. ███ ██████████ and failure to comply with ████ department policy failed the officers who were entitled to a complete and thorough investigation whereby their names could have been cleared, and is not in keeping with acceptable best practices. Further, this failure opens the Town of Salem, as well as the involved officers, to unnecessary liability.

- ███████████ further violated the supervisor's due process, as well as the due process of the other officers involved. By making the decision ████████████████ ██████████ of the allegations, ███████ enabled the complaint to go unchallenged. A thorough investigation, whereby both sides of the conflict were able to explain and justify their actions or inaction, might have led to a satisfactory outcome for all parties. However, ████████████████ or lack thereof, in fact, do the opposite and exhibit a preference for the supervisor, thereby confirming the complainant's concerns of preferential treatment on the supervisor's behalf and against the complainant.

- Kroll further notes that supervisors' interactions involving members of his family and friends, while reporting as a member of law enforcement, are quite concerning. Kroll is aware of at least four instances in which complaints were made against ███████ alleging inappropriate actions against individuals involved with his family. One of these interactions resulted in a criminal complaint filed against ███████ that led to no administrative

 

Drummond Woodsum

action by the Salem PD. Kroll notes that similar actions by patrol officers or other members of the department have resulted in significantly different responses.

9.  Kroll was contacted by an attorney for an individual who was arrested and facing criminal charges. The attorney, as well as several others, believed that Kroll was tasked with conducting an independent investigation of the facts regarding their complaints. (Kroll informed every citizen that its role was to conduct an audit of complaints filed with the Salem PD and determine if the IA process was consistent with best practices.) The attorney explained that he had submitted a complaint alleging false arrest and excessive force by the Salem PD against his client to the Attorney General's Office. The attorney identified over 12 witnesses who all signed affidavits. The attorney also provided three videos of the incident. The attorney informed Kroll that the Attorney General's Office had referred the matter back to the Salem PD after finding no criminal actions. The attorney was informed through media reports that the Salem PD had conducted an internal investigation and cleared the officers of any wrongdoing. The attorney alleged that none of his witnesses were contacted during the Salem PD's investigation.

As previously noted, the Salem PD initiated an informal inquiry relative to this matter. Kroll notes that there was no documentation of Garrity rights being issued or interviews of the involved officers. There was no outreach to the complainant or the identified witnesses who corroborated the complainant's version of events. However, there was an attempt to obtain statements for those who supported the officers' version of events. There were no phone calls, emails or letters between the officer conducting the internal inquiry and the attorney for the complainant. The complete investigation was conducted in less than 24 hours and a report of not-sustained was issued. This complaint was not elevated to a formal complaint even though it met the criteria under Salem PD's rules and regulations. The response was not in keeping with the department's policies and certainly not in keeping with law enforcement best practice. In addition, only after adverse media coverage of the complaint aired, the department began active outreach to identify those who could discount the complaint and support the officers' version of events, while simultaneously conducting no outreach to the complainant or those who supported the complainant. The department claimed that they did not contact any of the complainant's witnesses because the complainant had never come to the Salem PD and signed a written complaint form. This is a complete violation of the Salem PD complaint policy and can even appear to be negligent or retaliatory in nature.



Drummond Woodsum

Salem PD personnel, interviewed by Kroll, stated that they were unaware of any complaints regarding the manner in which they were policing the community. They said that they felt that their officers were very professional and received very few complaints, noting that they had not heard of any such concerns as those relayed to the town manager. Kroll conducted a simple Internet search and identified the following:

███████████

I have been going to Salem for years and I have been working in salem for the past year and a half. Every experience I have had with the Salem Police Department is negative. I cannot recall interacting with an officer that seemed to care about helping people. I have seen officers violate traffic laws to many times to count. I've seen them turn on their lights to run a red light just to turn them off again after the intersection. I've seen them make illegal u-turns without lights or a siren on and I've seen them driving well above the speed limit without lights or siren on.

Recently I called to complain about an officer excessively speeding without his emergency lights or siren on and the woman that worked at the station on the other end of the phone was very rude, and she made it clear that she did not care about anything I was saying.

I am in no way writing a bad review because i don't like cops. I do like cops. I understand that police officers have a dangerous and stressful job, i respect that. I think that no city, state, or country could function without them. There is something wrong with this towns police force. They do not set an acceptable example and they hold themselves higher than civilians.

███████████

Women who answers the phone obviously doesn't care to help, extremely unpleasant. Told my girlfriend "don't call next time" and "I don't care." Serve the public, what a joke.

███████████

Went to visit my family may 21/ 2018 stayed at the red roof hotel and ended up going to Wendy's to buy some food came back and got harassed by 2 salem Nh police man younger than my kids followed me from the lights all the way to my room inside the red roof property so I parked and got out my car walking to my door the cop finally stopped me and said what you doing here meanwhile this is a hotel what do u do In hotels sleep lol so I told him I was in the hotel to sleep he Asked for my I'd illegally but i still gave it to him.(i have nothing to hide) he told me that this hotel ███████████████████ok I don't do any of that so I don't care so the other cop said to me what was that inside your car blood inside the center console. Meanwhile i got out my car before they stopped me wow lol. So I said no so he kept going is that weed inside your center console i said no so he kept going are u high i don't care about weed we all do it i said no and had enough of the unlawful activity going on in my face by salem Nh police 🙇 and I told them I was recording them for my safety they both jumped up and said no u ok u good to go wow I never seen so much corruption from police officers that are supposed to be public servant not public intimidators and i will be putting the video up on YouTube look it up under (corrupt salem Nh police 🙇 )



The stigma of the Opiate Epidemic is unfortunately alive and well within the Salem PD, my son overdosed and was essentially dead, the police stood there watching ME administer Narcan and perform 15 minutes of CPR, when EMS arrived, and THEY WERE PHENOMENAL, one particular snake of a cop told me to stop calling 911 when my son overdoses, he repeated this more than once that night ... Officer Diresta was wonderful ... When I tried to file a grievance against this disgusting public servant he refused to give me his badge number, and I was denied my RIGHT to speak with the Captain or Chief, when I called the Town Manager 5 times I never received a response ... This could be ANYBODY's child ... I had to go all the way to the GOVERNOR and file an official written complaint about this incident! SUBSTANCE USE DISORDER KNOW NO SOCIOECONOMIC BARRIERS, FORTUNE OR FAME, GENDER OR EHNICITY, SEXUAL ORIENTATION, OCCUPATION OR POLITICAL VIEWS!! NO ONE IS IMMUNE!! SHAME, SHAME, SHAME ON THE SPD, and the Town Manager ... They are supposed to PROTECT AND SERVE ... SPD NEEDS SOME INTERVENTIONAL WORK SHOPS AND START CARRYING NARCAN ... I DON'T CARE ABOUT THEIR PERSONAL OPINION, DO YOUR FREAKING JOB! IF IT WAS ONE OF THOSE COPS KIDS I BET THEY WOULD BE SINGING A DIFFERENT TUNE ...

Called them last night after an issue with the guy next door, they said they would send a car. Not only did they not show up but the neighbor had his guests esclate the tensions by having them threaten me.

They are packed with over the top most unprofessional conduct and I am not impressed. Unless you know someone. 4 car's show up on a pullover. They have the worst bullying and harassment. Especially when you don't kiss their ass. They drink and drive? They do drug's no doubt about it. Their child good must have been scrappy. They definitely have been known to lie and say the complete opposite of what happened. Not all of them are Security officers and those who are professional are not enough. The Badge is a badge of honor. I have seen a lot of disgraceful and ignorant police.



Drummond Woodsum

# 7. Union Issues

There are currently three collective bargaining agreements in place with the Salem Police Department, one of which is the agreement between the Town of Salem, New Hampshire and the Salem Public Administrators Association, in effect from April 1, 2017 to March 31, 2020, covering the deputy police chief, police captains and police lieutenants; currently, Deputy Chief Morin is president of that union. He also oversees all IA investigations and complaints submitted to the Salem PD. Previously, Deputy Chief Shawn Patten served in this role.

**Interview with Deputy Chief Morin**

> MR. LINSKEY: Can you tell me about your role as Deputy Chief, what's your assignments, roles and responsibilities?
> DEPUTY CHIEF MORIN: I am the Deputy Chief, second in command, everything flows through me before it gets to the Chief so basically everything fall under my purview.
> MR. LINSKEY: So, roles and responsibilities with IAD would come with you if a complaint came in through the front desk or through a letter or an email, it would go to you?
> DEPUTY CHIEF MORIN: Yes.

Discipline, when properly executed, is corrective in nature; discipline that is properly and fairly applied is necessary in the workplace. As such, unions have a clear duty to represent their members and hold management accountable for the fair and corrective use of discipline. The responsibility of the individual tasked with implementing and overseeing the IA practices of a police department is often in direct conflict with those of the union tasked with ensuring the protection of its members. We saw this conflict when reviewing the IA investigation of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ was tasked with overseeing the investigation to ensure that it was fair and thorough, the deputy chief and then union president was also tasked with representing the rights of his union member. A violation of the policy also existed in allowing for a similar ranked officer to oversee the investigation of a peer. These two roles represent a conflict of interest and cannot be effectively carried out without inherent conflict.

Another example would be if a member of the Salem Public Administrators Association is involved in an incident and there is an allegation that the officer is operating a vehicle under the influence. Deputy Chief Morin, as the officer charged with overseeing a fair and thorough IA investigation, would likely request a field sobriety test and breathalyzer. However, it would be unconscionable for a union



Drummond Woodsum

representative to encourage a member of its union to voluntarily provide information or evidence that may be unfavorable to them.

Kroll further notes such a conflict relative to its audit of the Salem PD, whereby ███████████ as a member of the department's administration, had an obligation to support the administration's decision to conduct an independent audit. He also had an obligation and responsibility to instill in his officers the fact that Kroll's audit was an acceptable practice in law enforcement and was initiated in order to make improvements within the department and effectuate a positive impact on the officers' working conditions. However, ████████████ regularly and vehemently disparaged Kroll's efforts and the Town's decision – in various online and in-person methods – to conduct an audit in what he and the union considered was his role as union president. Kroll provides the following social media post of such comments:



Kroll interviewed several labor attorneys, many of whom work on behalf of law enforcement labor unions and/or police administrations. The attorneys were all unanimous in their opinion that an officer who oversees IA investigations and the corresponding disciplinary processes cannot possibly simultaneously serve as union president in an effective manner.

*Private and Confidential*



Drummond Woodsum

# 8. Findings and Recommendations

**Finding #1: The Salem PD's current CBAs contain some of the most restrictive language ever reviewed by Kroll. The CBAs, in their current form, severely impact the department's ability to effectively administer discipline.**

Currently, the New Hampshire Civil Statute of Limitations sets forth the time period within which the state must commence a criminal case. If the state attempts to bring an action against someone after the applicable time period has passed, that person charged can have the case dismissed. In general, violent crimes have a longer statute of limitations, and with some crimes, there is no statute of limitations. In certain instances, the statute of limitations may be tolled, or suspended, which grants the state additional time to commence a legal action. The statute of limitations is set forth as follows:

> **Section 625:8 Limitations**
> Murder: no statute of limitations
> Class A Felony: 6 years
> Class B Felony: 6 years
> Misdemeanor: 1 year

Currently, if evidence is discovered that an officer had, on- or off-duty, committed a felony (i.e. sexual assault, domestic violence) whereby the victim comes forward after delaying a report of the event, or evidence is discovered of some type of corruption (i.e. civil rights violations, stealing property from an evidence room, activity occurring six years and one day prior), the Salem PD would be prohibited from seeking disciplinary action against the officer. Since there is no ability to prosecute a person after the statute of limitations has expired, there would be no consequences imposed on the officer.

The CBAs' timelines may also impact the ability to conduct comprehensive investigations involving allegations of corruption. Law enforcement often receives complaints of corruption against employees. Some of these allegations have led to sweeping indictments or prosecutions of officers; however, others were found to be malicious or frivolous in nature. Currently, as the CBA stands, the department would be obligated to notify an officer within 10 days of the department's receiving allegations of corruption. However, such corruption investigations could take months, if not longer, to gather the appropriate evidence needed to prove or disprove the allegations. The current stipulation requires that if a department learns of a corruption investigation, they would have 10 days to complete the investigation or they would have to, by CBA mandate, notify the officer under investigation. Either option (1: continuing without notifying the officer



Drummond Woodsum

and forfeiting the ability to discipline them, or 2: informing the officer of an ongoing investigation) is not in keeping with law enforcement best practices.

**Recommendation #1: Kroll recommends a legal review and evaluation of provisions set forth in the CBAs, as well as revision, if needed.**

The CBAs, which are in place between the Town of Salem, New Hampshire and Salem Police Relief N.E.P.B.A. Local #22, in effect from April 1, 2016 to March 31, 2020, covering patrol officers, sergeants, dispatch supervisors, dispatchers and animal control officers; the Town of Salem, New Hampshire and Salem Public Administrators Association, in effect from April 1, 2017 to March 31, 2020, covering the deputy police chief, police captains and police lieutenants; and the Town of Salem, New Hampshire and the Salem Administrative and Technical Employees, in effect from April 1, 2017 to March 31, 2020, covering administrative staff and clerks, all need to be revisited. Efforts should be made to determine if the stringent time and notification requirements are legal and ensure they do not present a possible conflict with due process for the citizens of New Hampshire to ensure that their complaints are fairly, thoroughly and accurately investigated.

If due process is in question, all efforts should be made to renegotiate and amend these highly restrictive timelines.

**Finding #2: The current Salem PD General Order 65-7 regarding IA investigations and disciplinary procedures, while recently updated, must be reviewed, as the current order is not in keeping with acceptable law enforcement best practices.**

This rule provides a contradiction as to how Guardian will be deployed within the Salem PD and is inconsistent with what the department's administration told Kroll as to its deployment. The rule continues to place an undue emphasis on the complainant coming to the department to submit a formal complaint under pains and penalties of law, which Kroll believes may, in fact, discourage a citizen from filing a complaint.

When interviewed, Chief Donovan informed Kroll that he implemented at the Salem PD many of the policies and procedures utilized during his tenure with the Hartford Police Department. The Salem PD policy is set forth as follows:

**Kroll** | A Division of **DUFF&PHELPS**

Drummond Woodsum

### SALEM POLICE DEPARTMENT GENERAL ORDER

| CHAPTER:<br>PROFESSIONAL STANDARDS | DATE OF ISSUE:<br>06-04-2018 | G.O.#:<br>65-7 |
|---|---|---|
| SUBJECT:<br>INTERNAL INVESTIGATIONS &<br>DISCIPLINARY PROCEDURES | RESCINDS<br>G.O. # 65-3, dtd 10-19-2017<br>G.O.#65-7, dtd 06-29-2012 | REVIEW<br>2020 |

**I. PURPOSE:** The Salem Police Department must be accountable for the acts of its employees. A relationship of trust and confidence between the police and community is essential. The purpose of this General Order is to identify the procedures to be followed in dealing with violations of Departmental Rules and Regulations, Code of Conduct, Policies and Procedures, and other mechanisms for ensuring accountability to the public, the efficient and effective operation of the agency, and to provide for a safe workplace that ensures all employees are treated fairly and respectfully. (26.1.1)

This General Order defines the various types of disciplinary sanctions which may be imposed and delineates the responsibility for the initiation and conducting of disciplinary procedures. (26.1.1)

**II. POLICY:** All complaints will be accepted and documented. Any investigation based on a complaint will be conducted in an open and fair manner, with the truth as the primary objective. The Salem Police Department shall accept all complaints against their employees and will fully investigate all such complaints.

All violations of Department Rules and Regulations, Code of Conduct, Policies and Procedures, and all other directives which occur shall be dealt with in a fair and impartial manner, and in accordance with the Collective Bargaining Agreements in place with the Town of Salem. In all cases where disciplinary action is taken, the employee shall receive a copy of the documented discipline issued. (26.1.4)

An employee may be disciplined and/or terminated if there is found to be *proper reasonable cause*. Proper reasonable cause shall include, but shall not be limited to the following:

- Demonstrated incompetence;
- Recurring absenteeism;
- Recurring tardiness;
- Insubordination;
- Falsification of documents concerning payroll or other department operations;
- Behavior detrimental to the Town;
- Conduct unbecoming an officer.

**III. DEFINITIONS:**
**COMPLAINT** – Any expression of dissatisfaction or an allegation of misconduct which is:

- a) Unconstitutional, or
- b) Unlawful, or
- c) A violation of department policy

Similarly, the Hartford PD policy – developed and implemented in 1981 – is as follows:

**Kroll.** A Division of **DUFF&PHELPS**                    Drummond Woodsum



Both policies address signing and swearing to a complaint, as well as the requirement that staff direct complainants to this practice. However, there is also a caveat noting that failure to sign the complaint form does not prevent it from being documented or investigated fully.

Kroll notes that much has changed in the Hartford PD due to a federal consent decree focusing, in part, on the department's IA complaint program and disciplinary process. The Hartford PD has recently had federal oversight of its department extended to 2019 and has made wide-reaching changes in how they handle citizen complaints since the policy was enacted in 1981.

More notably, it is Kroll's belief that each and every complaint should be considered on its merit. The Salem PD's current rule has led to formal complaints being handled as informal inquiries, often leading to a limited investigative process that violates a citizen's due process, as well as the protections afforded to officers under the CBA. Similarly, the very questioning of an officer without an explicit signed waiver of his/her Garrity rights is in direct violation of the CBA and can negatively impact the investigation if wrongdoing is uncovered.

**Recommendation #2: Develop a new policy**

Kroll believes that this policy should be reviewed and amended.



Drummond Woodsum

**Finding #3: The current Salem PD IA investigative process is not compliant with the department's own policies and procedures and does not meet minimum acceptable law enforcement best practices.**

Kroll's review found several instances in which IA investigations did not follow the policies and procedures of the Salem PD, including many complaints that originated from outside sources. Serious allegations of misconduct were placed in limbo or discarded without a full or fair investigation, which seriously impacted the due process rights of citizens and the personnel of the Salem PD. Often these complaints were not investigated because the department's leadership stipulated that a complaint was not "official" until a victim comes to the department and signs a formal complaint. However, the rule clearly states that the Salem PD accepts all complaints. Further, although leadership agreed in Kroll's interviews that an email complaint was the same as a written complaint, Kroll learned that complainants who sent emails were advised to come to the department and make a formal written complaint. Even in some cases whereby a complainant did come to the department and submit a written complaint under pains and penalties of perjury, the department did not conduct even basic, simple investigative efforts.

Further, the leadership of the Salem PD has an improper understanding of what the New Hampshire Attorney General's Office does when reviewing a police misconduct complaint. The Attorney General's office only conducts a preliminary review to see if there are obvious signs of criminal actions by individuals. They may see evidence right away that prompts them to open a full investigation, or they may request additional information. They then provide an opinion as to whether they will formally investigate criminal misconduct or decline to move forward. If they decline conducting a full investigation, they can refer the complaint back to the local police department for an administrative review for potential non-criminal misconduct. It is the department's responsibility, then, to ensure that there were no violations of rules, regulations, professionalism or other legal issues. However, Kroll determined that the Salem PD failed to follow through with the Attorney General's Office's recommendation for further review, providing two reasons: "The AG unfounded the charges" or "There is no complaint. No one came in and filled out the complaint form." These responses are in no way an acceptable practice.

Kroll further noted that while some investigations were conducted in a full and comprehensive manner, others did not include basic investigative techniques. Kroll's investigation determined that allegedly full and fair investigations consisted of a cursory review of reports previously filed by officers, occasionally supplemented with an informal conversation with an officer without advising them of their CBA rights



or providing required Garrity warnings, considered no independent information or evidence and often were closed within hours without speaking to the complainant or any of the complainant's witnesses.

Kroll also learned that there were perceptions inside and outside of the department that the decision to investigate a complaint and the process by which the Salem PD investigated IA complaints were based on who you were or with who you aligned yourself in the department's administration. In some instances, Kroll found officers who faced complaints of alleged criminal activity who were placed on administrative leave and had a restricted weapon status. They faced both criminal charges, as well as internal investigations, as to their alleged conduct. However, Kroll also found one instance in which a supervisor, who was part of the administration, exhibited even more egregious felonious conduct but whose conduct was disregarded by the department. He was able to continue with his duties without being placed on administrative leave or being subjected to an IA investigation.

Kroll also learned of several instances relative to improper conduct by a supervisor, as relayed by a previous town manager to Chief Donovan. Chief Donovan allegedly agreed that the allegations were concerning and informed the previous town manager that he would address the concerns directly with the supervisor and personally counsel the officer. However, these complaints were reportedly discarded, and no formal action was taken.

Kroll also determined that citizens were actively dissuaded from filing complaints. In one interview, a supervisor of the IA program stated that he wanted a complainant to come to the department to submit a formal complaint so that the department could then prove that the complainant misstated the facts and seek criminal charges against the citizen:

> *"why she's not going to come in, because she's not going to come in and write this statement down and swear to it to be true, because when she does, and we disprove it, and we will, we're going to charge her, that's why she's not coming in. She went to Chris [town manager] to get exactly what has transpired here…"*

This statement and attitude by a senior leader who has oversight for the professionalism of the department is quite concerning and certainly exposes some truth behind comments that the department makes it difficult for the public to submit a formal complaint.

 Drummond Woodsum

**Recommendation #3: Kroll recommends a complete overhaul of the Salem PD IA program. Further, those involved in developing and implementing the program must be educated on the best acceptable law enforcement practices and trained to properly conduct IA investigations. The department leadership must be aligned with these goals to ensure proper execution, and at a minimum, the following should be adopted immediately into any new IA process:**

- Implement the Guardian System to identify and track officer performance.
- Develop a comprehensive IA investigative check list.
- Accept any and all complaints, including those submitted in person, over the phone, in writing (including email), through third parties and anonymously.
- Initiate investigations proactively, even for those where no formal complaint is made but for which information is developed from lawsuits, social media posts or any other means.
- Investigate any and all complaints regardless of perceived severity or perceived biases against the complainant.
- Provide officers with formal IA investigative training.
- Amend the complaint process to eliminate the potential for intimidation towards complainants.
- Implement consistent investigative processes, documentation and disciplinary actions for all members of the department to avoid disparate action based on relationships.
- Administer standard outreach to all complainants, as well as witnesses.
- Record audio statements for all interviews, when possible.
- Conduct periodic audits of IA investigations, both internally, as well as via external third parties.
- Provide timely notification of complaints, as well as outcomes, by electronic and/or certified mail.
- Implement a consistent protocol for recordkeeping to ensure complete and accurate case files.
- Ensure compliance with the department's CBAs for officers' due process rights.

**Finding #4: There is a mandatory retention period for IA investigative files as stipulated by the New Hampshire Attorney General's Office. The Salem PD may not be compliant with this regulation.**

The Salem PD's policies indicate that there should be a locked file cabinet in Chief Donovan's office to store IA complaints and case files, including those that were sustained and not sustained. The town manager directed Chief Donovan to provide Kroll with all IA investigative files for the preceding five years. However, despite this directive, the files were seemingly incomplete, as there were no Garrity forms, no audio recordings and many missing documents / whole case files. Kroll was also provided



Drummond Woodsum

with several not sustained and unfounded complaints, allegedly provided by happenstance during the records collection process, despite the department's belief that these files were purged. Kroll disagrees with this assertion, as the rule stipulates that all sustained and not sustained complaints should be kept for the entirety of an employee's career.

However, there is seemingly confusion within the senior administration of the department, as Chief Donovan informed Kroll that the department does not maintain not sustained or unfounded complaints. However, Deputy Chief Morin stated that the files are, in fact, stored in a file cabinet in the chief's office. As a result of the discrepancy, Kroll re-interviewed Chief Donovan and asked if such a cabinet existed in his office. Chief Donovan stated that he did not retain the files. Therefore, if the files are not retained, then the department is in violation of Salem PD GO 65-7, as well as the New Hampshire Attorney General's guidelines. ███████████████████████████████████

██████████████████████████████████████████████████████████████

███████████████████████████████

**Recommendation #4: Kroll recommends that the Salem PD update its current recordkeeping system for IA investigative files in consultation with best practices and as directed by the Attorney General's Office.**

**Finding #5: The deputy chief in charge of IA investigations should not be union president, as it is a conflict of interest to oversee IA investigations and represent the interests of union members.**

**Recommendation #5: Kroll recommends that the deputy chief be responsible for assisting with contract negotiations for the department but be prohibited from serving as union president.**

**Finding #6: As detailed in Kroll's secondary report relative to time and attendance concerns within the Salem PD, members of the administration are also known to work detail assignments, often during regular working hours. It is Kroll's opinion that these detail assignments may adversely impact the supervisors' ability to properly oversee the department's IA program.**

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████



Drummond Woodsum

**Recommendation #6: Kroll recommends an evaluation as to the impact that Chief Donovan's working details during regular work hours may have relative to his failure to properly supervise the department's IA program.**

**kroll.com**